398 So.2d 220 (1981)
C.C.I. and N and Wife Mrs. N, Appellants,
v.
The NATURAL PARENTS, Appellees.
No. 52708.
Supreme Court of Mississippi.
May 13, 1981.
John H. Fox, III, Fox, Gowan & Biggers, Christopher A. Shapley, Brunini, Grantham, Grower & Hewes, Jackson, for appellants.
Herman B. DeCell, Henry, Barbour & DeCell, Yazoo City, for appellees.
Before SMITH, P.J., and WALKER and BROOM, JJ.
*221 BROOM, Justice, for the Court:
Adoption of an infant child and revocability of written consent for adoption are featured in this case appealed from the Chancery Court of Yazoo County. The natural parents (John and Jane Doe herein), then unmarried and minors, executed documents surrendering the infant child (baby herein) to C.C.I. for adoption.[1] Subsequently, the young natural parents married each other and petitioned the court for legal custody and adoption of the baby. By that time C.C.I. had placed the child for adoption with N and his wife who filed a cross-petition for adoption against the natural parents. C.C.I. and the Ns appeal from the final decree which allowed the natural parents to adopt the child. We reverse.
The baby, who is the central figure in this cause, was born February 12, 1980, unto Jane Doe, a 20-year old with two years in college. On April 5, 1980, Jane married John. They were dating each other for some time before John, a 17-year old high school senior, learned in June of 1979 that she was pregnant. Although he offered several times to marry her and gave her a diamond ring in August 1979, she insisted on putting the baby up for adoption. There was much discussion from time to time among the two young people, Jane's parents, and a representative of C.C.I. about surrendering the baby to C.C.I. On February 20, 1980, Jane executed documents surrendering the child to C.C.I. and consenting to its adoption. John executed an identical document on February 26, 1980. On April 5, 1980, however, they married each other and within a few days filed their petition to adopt said child and regain its custody, charging that they had signed the surrender-consent documents because of undue influence and duress. Defendants were C.C.I., to whom they had surrendered custody, and the Ns whom C.C.I. had given custody of the child by instrument labeled "Adoption Placement Agreement." The Ns answered the Does' adoption petition and filed their own petition for adoption of the child.
After signing the consent documents on February 26, 1980, John told his parents the next day what he had done and contacted attorney D. By letter dated February 27, 1980, the attorney addressed a letter to C.C.I. stating that John was revoking and rescinding the surrender (consent) instrument. When the adoption matter was tried the Does were living in a two-bedroom apartment in Yazoo City. Testimony indicated that three days after the baby was born on February 12, 1980, while John was visiting Jane in the hospital, the two young parents decided they would get married and keep the baby, but the next day Jane told him that she did not want to get married. The Does' amended adoption petition averred that they surrendered the baby as a result of undue influence. John testified that although there was a great deal of indirect pressure on him to resolve the situation concerning the baby, no one besides Jane and her mother had attempted to harass or force him to sign the surrender forms. Testimony established that when she became pregnant, Jane was 19 years old, had attended college for about two years, and was earning $600 a month doing secretarial and bookkeeping work. According to Jane, when she discussed with her mother the baby's future in January 1980, her mother told her that if she decided to keep the baby she would have to get out on her own. Her mother contacted C.C.I., and in response to her inquiry one of C.C.I.'s maternity case workers talked with Jane concerning adoption and the problems she would face if she decided to keep the baby. After the baby's birth, Jane's mother (Mrs. Coe) discussed the situation with John who asked her for her opinion. According to Mrs. Coe, she told him "that under the circumstances that he and Jane were in that I thought it was the best thing for them to do to give the baby up for adoption." The next day John came to the *222 Coe home and told Mrs. Coe that he had discussed the matter with several attorneys and had decided to sign the papers. Ultimately the lower court decreed adoption of the child unto the natural parents, the Does.
C.C.I., a non-profit corporation, is a licensed maternity home and adoption agency providing foster care and related child services. By answer, C.C.I. denied that John executed his surrender of parental rights under undue influence and duress and denied that his adoption of the child would serve its best interest.
First argument is that the court erred in holding Mississippi Code Annotated § 93-17-9(c) (1972) unconstitutional as to that portion which provides that, "In the case of a child born out of wedlock, the father shall not be deemed to be a parent... ." Mississippi Code Annotated § 93-17-9 (1972) in effect states that a necessary party to an adoption under § 93-17-5 may execute the surrender of a child to a "home." We do not reach the constitutional issue because other issues are dispositive. Our rule is that we do not hold statutes unconstitutional when the decision may rest on other grounds. Kron v. Van Cleave, 339 So.2d 559, 563 (Miss. 1976).
DID JOHN AND JANE EXECUTE THE DOCUMENTS SURRENDERING THE CHILD TO C.C.I. AS A RESULT OF UNDUE INFLUENCE? In obtaining custody of the infant child who is subject to this suit, C.C.I., a licensed "home," was acting pursuant to Mississippi Code Annotated § 93-17-9 (1972), which reads:
Any person required to be a party to an adoption proceeding by section 93-17-5 may execute the surrender of a child to a home by sworn or acknowledged instrument which shall include the following: the name of the child and the home; that there is thereby vested in the home the exclusive custody, care and control of such child; that all parental rights to such child including the right of inheritance are relinquished by such person; provided, the rights of inheritance of the natural parents and the child shall not be affected until entry of a final decree of adoption; that the home is authorized to execute a consent to adoption as provided by this chapter and that process in any adoption proceeding is waived; that such surrender shall be irrevocable and that such person will not, in any manner, interfere with the custody of such child thus vested in the home. Said instrument shall not be executed until three (3) days after the birth of the child and shall effectually vest in the home all rights thus surrendered and all powers thus created, with the right and power to execute the consent to adoption as required in this chapter authorizing the court to vest in the child and the adopting parent or parents the rights herein provided. (Emphasis added).
The child's date of birth was February 12, 1980, eight days after which Jane signed the surrender form to C.C.I. authorizing it "to execute the consent to adoption." On February 26, John also signed an identical surrender form. Both forms were notarized. There is no dispute that the statutory requirements of § 93-17-9, supra, were complied with, but the Does' position is that they signed the surrender forms as a result of pressure or undue influence.
No Mississippi case has been cited, and we have found none defining what constitutes undue influence in obtaining the biological parents' consent to an adoption. Instructive are two rather recent annotations: 8 Am.Jur., Proof of Facts 2d 481 (1976)  Undue Influence in Obtaining Parents Consent to Adoption of Child; 50 A.L.R.3d 918 (1973)  What Constitutes Undue Influence in Obtaining a Parent's Consent to Adoption of Child. The A.L.R.3d article notes that undue influence is one of several grounds demonstrating a lack of voluntary consent on the part of the parents. Several of the means which may constitute undue influence include over-persuasion, threat of economic detriment or promise of economic benefit, the invoking of extreme family hostility both to the child and mother, and undue moral persuasion. Because undue influence is such a broad concept, cases *223 must be resolved upon their particular facts. General law is that the party asserting undue influence has the heavy burden to show that the consent was obtained by undue influence. Such a burden must be met by clear and convincing evidence, and there is no presumption that a party has exercised undue influence upon another. A mere preponderance of evidence on the issue of undue influence is not sufficient. 8 Am.Jur., Proof of Facts 2d 503-505 (1976).
The Does asserted below and here that C.C.I. through its maternity case worker exerted undue pressure upon Jane to surrender the baby for adoption, but this charge is not supported by the record. We find no logical means to interpret the testimony to establish that the case worker exerted undue influence upon Jane although it is true (and commendable) that she pointed out to Jane problems she would face as an unwed mother. The record shows that the case worker told Jane that if she were unsure about signing the surrender forms after the baby's birth, C.C.I. would keep the child in a foster home for two to three weeks until she (Jane) was certain of her decision. Also the Does contend that John was "over-pressurized" by Jane's mother, Mrs. Coe, but the record does not bear this out. Although Mrs. Coe did contact John to discuss signing the surrender forms, she left the decision to him. It was the next day that John informed Jane and her mother that he was willing to sign the surrender document.
Appellees invite this Court to pay particular attention to Sorentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127, 367 A.2d 1168, 1169 (1976). The facts in this New Jersey case, however, are readily distinguishable from those before this Court. In Sorentino, a 16-year old unwed mother gave birth. The 18-year old father was unwilling to marry her, and the girl's mother was unwilling to allow her daughter to remain in her home with the child. Therefore the girl placed the baby in a foster home for thirty days through the Society of Elizabeth. When the young mother informed the agency that she wanted her child back at the end of the thirty-day period, the agency supervisor made "threats of harassment and litigation." The Supreme Court of New Jersey concluded that "she was coerced within a half-hour or so into signing a surrender of the child for adoption."
Unlike the 16-year old mother in Sorentino, Jane was 20 years old at the time the baby was born. She had attended college two years, was steadily employed, earned $600 a month, and had undergone several sessions of counselling with C.C.I. Clearly she was well aware of her options. Unlike the agency supervisor for the Society of Elizabeth, C.C.I. and its case worker exhibited good faith on their part by explaining to Jane that she could take several weeks to make up her mind about signing the surrender form after the baby's birth.
Along with C.C.I., Jane was a respondent to John's original adoption petition. Her sworn answer denied that John's execution of the parental surrender resulted from undue influence, and she likewise denied that adoption by John would serve the child's best interest. As part of her answer, she affirmatively charged that the child's best interest would be served by permitting its adoption, not by John, but by "a qualified couple... ." Subsequently and only after her marriage to John, did Jane contend, in direct contradiction of her original answer, that she executed the surrender document under undue influence. At the trial, Mrs. Doe, John's mother, on cross examination testified negatively as to undue influence being exerted upon Jane and John in connection with their execution of the surrender forms. The following is excerpted from her testimony:
A. Well, I did not believe ... I don't think anybody pressured Jane into giving the baby up for adoption. Maybe I should state it that way.
Q. Recalling your meeting with Mr. S. that you testified about, isn't it a fact that you went to see Mr. S. to determine your son's legal rights insofar as the adoption papers were concerned and whether or not he *224 should sign them or had to sign them? That was why you went to see Mr. S., was it not?
A. No. We went to see Mr. S. as far as John's legal rights, as far as the baby was concerned.
Q. This was before John signed the surrender, was it not?
A. Yes.
There is no doubt that John and Jane were not free from emotions, tensions and inescapable anxieties which resulted from her pregnancy during the time preceding their marriage. No doubt almost any person situated as they were would experience emotional trauma, but there is no law to the effect that surrender of a child is valid only if done without such distress. If such were the law almost any child surrender and subsequent adoption decree could be attacked. We held in Wherry v. Latimer, 103 Miss. 524, 60 So. 563, 565 (1918) as to what was required in order to establish undue influence. The Court quoted from Burnett v. Smith, 93 Miss. 566, 571, 47 So. 117 (1908):
... not every influence is undue, and undue influence cannot be predicated of any act unless free agency is destroyed, and that influence exerted by means of advice, arguments, persuasions, solicitation, suggestion, or entreaty is not undue, unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency. Nor is influence ordinarily considered undue which arises out of sympathy, kindness, attention, attachment, or affection, gratitude for past services, desire of gratifying the wishes of another, or of relieving distress, claims of kindred and family or other intimate personal relations, love, esteem, social relations, prejudices or flattery.
Duckworth v. Allis-Chalmers Manufacturing Co., 247 Miss. 198, 203, 150 So.2d 163 (1963) held:
Duress and compulsion go to the question of reality of consent to a contract. The ultimate fact for determination is whether the complaining party was deprived of free exercise of his own will. The conduct of the dominant party must have been such as to override the volition of the victim. (Emphasis added).
At trial, the chancellor did not find that John and Jane had their free will destroyed when they executed the surrender documents. In effect, he found that the advice of Mrs. Coe and C.C.I.'s case worker prevailed in bringing about the parental surrenders.
The assertion that John surrendered the baby due to undue influence seems to be related to two conversations he had with Mrs. Coe. He testified that approximately 13 days after the baby's birth, Mrs. Coe told him that her husband was "mad as hell." Further, he testified that Mrs. Coe told him "that Jane was in a bad state of mind and I needed to go on and sign those papers and get it all over with." After his conversation with Mrs. Coe, during which it is said that she unduly influenced him, he testified that "I wasn't going to sign them." Thus it follows that her discussion with John did not unduly influence him to sign the surrender forms because at the conclusion of the conversation he stated that he would not sign the papers. John actually signed the surrender of the baby before a notary public in a finance company's office in the presence of Jane's mother and aunt after he had consulted with an attorney and travelled to the notary's office in his (John's) car.
During his cross examination John was asked if anybody (excluding Jane and her mother) had harassed him or tried to force him to make any particular decision as to what he should do with the baby, and his answer was, "No, sir." He denied that anybody threatened him as to what he should do with the baby although he stated that Mrs. Coe said, "I would be dragged into court." One of the striking things about John's testimony is the following excerpted from what he said on cross examination:
Q. Haven't you testified before that if that baby had been a boy, you wouldn't have signed that Exhibit 1?
A. Yes, sir. If I had known it was a boy.
*225 In her testimony, Jane testified that she and John were pressured, but she would not testify that she ever saw her mother harassing or intimidating him in any way. Before Jane signed the surrender forms for adoption of the child, she talked with an attorney. The following colloquy developed during Jane's testimony:
"What were your parents having to say about it at that time?" Answer: "They said it was my responsibility; that I had to make the decision; it was not theirs." Do you recall that question and that response?
A. Yes, but they thought that. That it would be best.
Q. Is it your testimony that your mother told you that you should put the baby up for adoption?
A. No, she didn't tell me that.
We think the record shows without doubt that during her pregnancy and surrender of the child, both Jane and John experienced heightened emotion and vacillation, along with much agony. Nevertheless, this does not show that their execution of the surrender documents was without the free exercise of their own volition untainted by domination, threats or coercion of another person. Allen v. Volunteers of America, 378 So.2d 1030 (La. 1979).
DID THE CHANCELLOR ERR IN HOLDING THAT THE PARENTAL SURRENDER EXECUTED IN COMPLIANCE WITH MISSISSIPPI CODE ANNOTATED § 93-17-9 (1972) COULD BE REVOKED OR WITHDRAWN UPON A SHOWING OF GOOD CAUSE? The Does contend that § 93-17-9, supra, does not make a surrender to an agency irrevocable, but the plain language of the statute does not support them. The Does assert that the natural parents' consent should be revocable prior to the entry of any adoption decree and cite Wright v. Fitzgibbons, 198 Miss. 471, 21 So.2d 709 (1945). The Wright decision was handed down prior to enactment of our present adoption statutes making voluntary surrender irrevocable. In addition, the facts in Wright are noticeably different from those in the case presently before this Court. At issue in Wright was whether the natural mother of the child had abandoned her three-week old infant.
The Supreme Court of Louisiana had to construe the Louisiana surrender statute which is markedly similar to ours. In Golz v. Childrens' Bureau of New Orleans, Inc., 326 So.2d 865 (La. 1976), both parents of a legitimate child executed surrender agreements to the Children's Bureau of New Orleans, Inc. After several conversations with the Children's Bureau, Mrs. Golz brought her child to the agency and asked the case worker to provide foster care for the child. After several days in foster care, the Golzes came and secured their infant. Approximately four months later the Golzes telephoned the Bureau and expressed a desire to place the child for adoption. In conversation with the Golzes at the Children's Bureau, the case worker informed them that signing the surrender form was irrevocable. Nevertheless the Act of Surrender was executed by the parents and the case work supervisor for the Children's Bureau according to the provisions of the statute. The following day the parents requested that their child be returned to them. A child court found that the Act of Surrender could not be revoked. On appeal the Golzes contended that consent could be revoked under the statute. The Louisiana statute (LSA-R.S. 9:402) reads:
Voluntary surrender of custody of child; procedure
Any parent of a child, whether the child was born in wedlock or out of wedlock and whether the parent is over or under twenty-one years of age, may surrender the permanent custody of his child to an agency for the purpose of having the child adopted by appearing before a notary and two witnesses and declaring that all of his rights, authority, and obligations, except those pertaining to property, are transferred to the agency. This authentic act shall be signed by the agency and shall constitute a transfer of custody to the agency after which the agency shall act in lieu of the parent in subsequent adoption proceedings. No surrender *226 of the custody of a child shall be valid unless it be executed according to the provisions of this Part.
The statute provides that a parent surrenders "permanent custody of his child to an agency for the purpose of having the child adopted." Writing for the Court, Chief Justice Sanders concluded:
... an act of surrender executed by both parents of a legitimate child to a licensed adoption agency in compliance with LSA-R.S. 9:402 is irrevocable.
Absent a showing by the parent(s) establishing either fraud, duress, or undue influence by clear and convincing evidence, surrenders executed in strict compliance with the safeguard provision of § 93-17-9, supra, are irrevocable. Strong policy reasons support such a holding. If a parent is allowed an unrestricted right to challenge his act of surrender, uncertainty and confusion among adoption agencies would undoubtedly result, making placement more difficult which would be detrimental to the children involved as well as to the public welfare. The statutory safeguards are themselves sufficient to guard against a hastily made decision.
Both Jane and John executed surrender forms in strict compliance with the statute, and their parental surrender forms were signed in the presence of a notary public who took their acknowledgment. This case, therefore, may be resolved without considering the constitutionality of Mississippi Code Annotated § 93-17-5(c) (1972). Section 93-17-9, supra, gives the adoption agency "all rights thus surrendered and all powers thus created, with the right and power to execute the consent to adoption as required in this chapter... ." Upon this record and under the statutes cited, we conclude that the decree granting adoption of the child unto the Does after their voluntary surrender of it according to the pertinent statutes should be set aside and the Ns allowed to present their proof in support of their petition for adoption. The Ns appealed with supersedeas and have the child in their custody.
Revocability of the surrender of a child and consent for another to adopt a child is not to be decided upon rigid or technical rules. Such a decision must be made upon sound judicial discretion. Here revocation was asserted by the natural parents upon the grounds of undue influence and duress, but the testimony in that regard was less than clear and convincing. The chancellor's finding that John and Jane surrendered the child for adoption "as a result of undue influence exerted upon them" is contrary to the overwhelming weight of the testimony and manifestly in error.
Different lines of cases on the revocability issue are discussed in Chapter Eighteen, § 18.4, Clark's Law of Domestic Relations (1968) Hornbook Series. Clark at page 626 states that "Whether consent may be revoked is to be determined initially by the applicable statute." Here we think that under our statute § 93-17-9, supra, revocation can be allowed but only where sufficient legal grounds are established by clear and convincing testimony, and such evidence is lacking here. Consent is not to be arbitrarily withdrawn. Clark, supra, page 627.
Accordingly, we must reverse the decree granting the adoption unto the Does and remand the cause for hearing on the petition of the Ns according to facts and circumstances shown to exist after remand. The petition of the Does is dismissed, and the petition of the Ns will then be triable in the court having venue jurisdiction pursuant to Mississippi Code Annotated § 93-17-3 (Supp. 1980), which fixes venue in the county where the petitioners reside or where the child resides, or "in which the home is located... ." According to the proof in this regard, venue, if not to be vested in the Chancery Court of Yazoo County, shall be in the proper chancery court to which venue may be changed and the cause transferred upon proper application and proof. In closing we point out that this is not a case where C.C.I. was the aggressor or employed any questionable practice by accepting the child whom Jane and John surrendered. C.C.I., according to the proof, is a licensed and very reputable *227 "home" which merely responded to the initiative of Mrs. Coe and Jane who set in motion the chain of events by which Jane and John forfeited any parental claim. To allow appellees upon this record to regain custody of the child would undermine the status and purpose of such homes and negate the meaning of the applicable statutes.
Under Mississippi Code Annotated §§ 93-17-25; 93-17-29 and 93-17-31, supra, an order will be entered here by this Court to the effect that all original records and documents of this cause be kept confidential. Further, all docket entries, pleadings and decrees necessarily open to the general public shall refer to the parties by initials or fictitious names as set forth in the first paragraph of this opinion.
REVERSED AND RENDERED AS TO DECREE OF LOWER COURT GRANTING ADOPTION OF BABY TO APPELLEES, THE NATURAL PARENTS. REVERSED AND REMANDED FOR FURTHER PROCEEDINGS UPON THE CROSS PETITION OF N AND HIS WIFE, MRS. N, NOT INCONSISTENT WITH THIS OPINION.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and HAWKINS, JJ., concur.
NOTES
[1] Pursuant to Mississippi Code Annotated §§ 93-17-25; 93-17-29 and 93-17-31 (1972), all the litigants are identified either by initials or fictitious names. C.C.I. is a foster home and adoption agency.