796 So.2d 975 (2001)
In the Matter of the ADOPTION OF J.M.M., A Male Child M.M., K.M. and C.M.
v.
NEW BEGINNINGS OF TUPELO, INC., John Doe and Jane Doe.
No. 1999-CA-01346-SCT.
Supreme Court of Mississippi.
June 28, 2001.
Rehearing Denied October 11, 2001.
*977 David Lee Robinson, Ashland, Attorney for Appellant.
Daniel J. Davis, Tupelo, C. Michael Malski, Attorneys for Appellee.
EN BANC.
SMITH, J., for the Court:
¶ 1. This case comes to this Court on appeal from the Chancery Court of Lee County which refused to set aside an adoption decree. Two prospective adoptive parents, John and Jane Doe, filed a Petition for Adoption on March 21, 1997. Attached to this petition by M.M., the natural mother, was a "Surrender of Parental Rights and Consent to Adoption." A final decree of adoption was entered by the chancellor on March 21, 1997. The natural mother and her parents, K.M. and C.M., appellants, filed a petition on December 30, 1997, praying that the final decree of adoption be vacated and set aside, and for the child to be returned to the natural mother. The judgment of the chancery court was entered on July 20, 1999, upholding the validity of the adoption and denying the mother's petition. Accordingly, a notice of appeal was filed by the appellants on August 12, 1999. We find that all adoption documents were properly executed in accordance with Miss.Code Ann. § 93-17-9 and that the appellants failed to meet their burden of proof. We also find that appellants failed to bring to the chancellor's attention his failure to rule on their motion for appointment of a guardian as litem (GAL), thus we apply the procedural bar. Notwithstanding the procedural bar, alternatively, we find no merit to this issue as it is not required by the applicable statute governing termination of parental rights, Miss.Code Ann. § 93-15-103(2). We, therefore, affirm the chancellor.

FACTS AND DISPOSITION BELOW
¶ 2. On February 24, 1997, the natural mother ("M.M."), then age 16, gave birth to a baby boy ("J.M.M.") at her home. She had successfully hidden her pregnancy from her parents until she gave birth in the bathroom at their home. M.M. was immediately taken to the hospital by her parents and remained hospitalized for two days.
¶ 3. M.M.'s father informed her that she would not be able to bring the baby into their home. He believed that she would face great difficulties trying to raise a child. According to M.M.'s father, M.M. was unwed, unemployed, young, and with limited education and means. However, M.M.'s father did discuss other options with M.M. There were two other relatives with whom M.M. could have lived had she decided to keep the child. M.M. testified that she was aware of these options.
*978 ¶ 4. New Beginnings of Tupelo, Inc. ("NBI"), an adoption agency licensed by the State of Mississippi, was contacted by M.M.'s family members shortly after J.M.M. was born. A representative from NBI visited the hospital twice on February 24, 1997, to provide M.M. and her family with information regarding the adoption process. On February 25, 1997, M.M. and J.M.M. were discharged from the hospital. M.M. testified that she walked across the parking lot of the hospital with her family and met Linda Rothenburger, an NBI representative. At this point, M.M. actually placed J.M.M. in the care of Rothenburger. On February 26, 1997, Rose Roberts, director of social services for NBI, traveled to M.M.'s home and again discussed adoption with M.M. and her family. Roberts left blank copies of forms that M.M. would have to sign to surrender her child for adoption. On Thursday, February 27, 1997, three days after J.M.M. was born, M.M. and her family went to NBI to sign the adoption papers and to meet the adopting family. Roberts presented M.M. with a document titled "Surrender of Parental Rights and Consent to Adoption." At this point, M.M. read it, initialed each page, initialed every line in one paragraph, and signed it. M.M. also signed an affidavit concerning an unknown father. M.M. indicated to Roberts that she had multiple partners and therefore did not know the identity of J.M.M.'s father.
¶ 5. M.M.'s signature appeared on all of the forms, and they were all notarized by Rothenburger. There is some dispute as to Rothenburger's whereabouts at the time that M.M. actually signed the papers. The chancery court ruled that Rothenburger was present and saw the documents being signed. The adoption was finalized on March 21, 1997. J.M.M. has resided with the adoptive family for more than four years now.
¶ 6. M.M. appeals to this Court alleging the following assignments of error:

I. WHETHER THE CHANCELLOR ERRED IN FINDING THAT THE "SURRENDER OF PARENTAL RIGHTS AND CONSENT TO ADOPTION" WAS VALID AND SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE?

II. WHETHER THE CHANCELLOR ERRED IN FINDING THAT THE CONSTITUTIONAL RIGHTS OF BOTH THE MINOR CHILD AND THE MINOR MOTHER WERE NOT VIOLATED?

DISCUSSION
¶ 7. Our Court has recognized that the standard of review and statutory basis for termination of parental rights is quite limited. "The chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test." Vance v. Lincoln County Dep't of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985)). "This Court will not overturn a Chancellor's findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong." Grafe v. Olds, 556 So.2d 690, 692 (Miss.1990) (citing Johnson v. Hinds County, 524 So.2d 947, 956 (Miss.1988)).

I.
¶ 8. The appellants argue that the chancellor committed manifest error when he found that the "Surrender of Parental Rights and Consent to Adoption" was a valid surrender of J.M.M. Our Court has held that surrenders executed in strict compliance with Miss.Code Ann. § 93-17-9 are irrevocable. C.C.I. v. Natural Parents, *979 398 So.2d 220, 226 (Miss.1981). After finding that the surrender complies with § 93-17-9, the biological parent(s) must either establish fraud, duress, or undue influence by clear and convincing evidence before an adoption decree will be revoked. Id. This two-part analysis will be addressed below.

A. WHETHER THE "SURRENDER OF PARENTAL RIGHTS AND CONSENT TO ADOPTION" WAS EXECUTED IN COMPLIANCE WITH § 93-17-9?

¶ 9. As worded at the time pertinent to this case, Miss.Code Ann. § 93-17-9 (Supp.1997) provided in relevant part:
Any person required to be a party to an adoption proceeding by section 93-17-5 may execute the surrender of a child to a home by sworn or acknowledged instrument which shall include the following: the name of the child and the home; that there is thereby vested in the home the exclusive custody, care and control of such child; that all parental rights to such child including the right of inheritance are relinquished by such person; provided, the rights of inheritance of the natural parents and the child shall not be affected until entry of a final decree of adoption; that the home is authorized to execute a consent to adoption as provided by this chapter and that process in any adoption proceeding is waived; that such surrender shall be irrevocable and that such person will not, in any manner, interfere with the custody of such child thus vested in the home. Said instrument shall not be executed until three (3) days after the birth of the child and shall effectually vest in the home all rights thus surrendered and all powers thus created, with the right and power to execute the consent to adoption as required by this chapter authorizing the court to vest in the child and the adopting parent or parents the rights herein provided.
. . . .
Miss.Code Ann. § 93-17-9 (Supp.1997). The current version of this statute was amended in 1998 to substitute "seventy two (72) hours" for "three (3) days" in the language quoted above. Miss Code Ann. § 93-17-9 (Supp.2000).
¶ 10. M.M. argues that the document entitled "Surrender of Parental Rights and Consent for Adoption" was not properly sworn to or acknowledged. In support of this allegation, M.M. testified that Linda Rothenburger, notary public and representative of NBI, was not in the room when she signed the document. For this reason, M.M. argues that there was no substantial evidence in the record to support the chancellor's finding that the document was valid and irrevocable.
¶ 11. On February 27, 1997, the day the adoption papers were signed, there was a board meeting being held in the conference room at NBI. M.M. signed the adoption papers in the outer office of NBI, in the presence of Rose Roberts, Linda Rothenburger, and M.M.'s family. No one unconnected to this adoption was present in the office when M.M. signed the documents. Roberts testified that there was no other area large enough to hold all of the people that were there with M.M. For this reason, they were using the outer office space at NBI.
¶ 12. M.M. testified that Rothenburger, the notary, was not in the room when she signed the papers. M.M.'s mother and father both testified that they did not recall seeing Rothenburger notarize the documents. M.M. testified that neither of her parents were present when she was signing the papers. K.M., M.M.'s mother, testified that she only came back in as they were finishing up. There is no dispute as to whether the signature is M.M.'s. In her *980 testimony, M.M. identified her signature on each of the documents.
¶ 13. Rose Roberts, Director of Social Services, testified that she was beside M.M. when the documents were signed. Roberts had previously left blank copies of all documents that would need to be signed with M.M. at her parents house on Wednesday, February 26, 1997. Before M.M. signed the documents, Roberts asked her if she had read and understood the papers that she was about to sign. M.M. indicated that she had read the papers and did understand. Specifically, Roberts testified that "[a]s she initialed the pages I, we got to the heavy print on the paper that is really the core of the surrender and as she was initialing that I asked her if she was sure she had read that and if she understood it, and she said that she had. And I said well let's read it together to be sure that you understand what all of those words mean. And I read the paper to her, the, of the, the capital letters that are written on that page, I read the entire content of that."
¶ 14. The record indicates that Linda Rothenburger was not seated at her desk when M.M. signed the adoption papers. However, Rothenburger was in the room and witnessed M.M. signing the forms. Roberts informed M.M. that she was signing these documents under oath and upon penalty of perjury. After M.M. had signed each form, Rothenburger affixed her notary seal to the documents.
¶ 15. The only "technical" challenge in this case is that the surrender was not sworn to or acknowledged in accordance with Miss.Code Ann. § 93-17-9. As earlier noted, the standard of review to appeals for adoption was stated in Grafe v. Olds, 556 So.2d 690, 692 (Miss.1990). "This Court will not overturn a Chancellor's findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong." Id. M.M. is the only one that testified Rothenburger was not in the room. M.M.'s mother and father were both uncertain as to Rothenburger's whereabouts. The chancellor heard testimony from Rose Roberts that Linda Rothenburger was in the room and saw M.M. sign the surrender documents. We find that there was enough evidence in the record to conclude that the requirements of § 93-17-9 were met. M.M. identified her signature on each of the documents, M.M.'s father testified to seeing M.M. sign the documents, Rose Roberts witnessed M.M. signing these documents, and M.M.'s mother saw M.M. "finishing up" the signing of the documents. Again, there is no dispute as to whether the signature is that of M.M.
¶ 16. We find there was substantial evidence in the record to satisfy Miss.Code Ann. § 93-17-9, and the chancellor was not manifestly wrong in finding that the technical requirements of the statute were satisfied.
¶ 17. Next, finding that the documents were signed in compliance with the statute, the adoption can only be revoked upon a clear and convincing showing of fraud, duress, or undue influence. C.C.I. v. Natural Parents, 398 So.2d 220, 226 (Miss.1981).

B. WHETHER M.M. SIGNED THE SURRENDER DOCUMENTS DUE TO FRAUD, DURESS, OR UNDUE INFLUENCE?

¶ 18. Although not specifically addressed as a separate issue, the M.M. attempts to argue that she had no other choice but to sign the adoption papers due to her father's persistence. This was her testimony throughout trial. After finding that a surrender complies with § 93-17-9, the biological parent(s) must either establish fraud, duress, or undue influence by clear and convincing evidence before an *981 adoption decree will be revoked. C.C.I., 398 So.2d at 226.
¶ 19. As our Court has previously stated, "not every influence is undue, and undue influence cannot be predicated of any act unless free agency is destroyed, and that influence exerted by means of advice, arguments, persuasions, solicitation, suggestion, or entreaty is not undue, unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency." Id. at 224 (quoting Burnett v. Smith, 93 Miss. 566, 571, 47 So. 117 (1908)).
¶ 20. In C.C.I., minor biological parents attempted to revoke their written consent for adoption. Id. The mother was 20 years old, and the father was 17 years old. Both parents executed documents surrendering the child to C.C.I. A short time after the papers were signed, the couple married and attempted to void the adoption decree by charging that they signed under undue influence and duress. Id. at 221. According to the biological mother, she was told that if she decided to keep her baby, she would have to get out on her own and leave her parents' house. Id. In upholding the adoption decree, our Court held that undue influence is defined as a lack of voluntary consent. Id. at 222. Also, this Court reasoned that:
Several of the means which may constitute undue influence include over-persuasion, threat of economic detriment or promise of economic benefit, the invoking of extreme family hostility both to the child and mother, and undue moral persuasion. Because undue influence is such a broad concept, cases must be resolved upon their particular facts. General law is that the party asserting undue influence has the heavy burden to show that the consent was obtained by undue influence. Such a burden must be met by clear and convincing evidence, and there is no presumption that a party has exercised undue influence upon another. A mere preponderance of evidence on the issue of undue influence is not sufficient.
Id. at 222-23 (citing 8 Am.Jur. Proof of Facts 2d 503-05 (1976)). The Court reasoned that there was no doubt that these two minors were not free from emotions, tensions, and anxieties during this period of time. Id. at 224. However, our Court noted that "there is no law to the effect that surrender of a child is valid only if done without such distress. If such were the law almost any child surrender and subsequent adoption decree could be attacked" Id. Regardless of these apparent emotions, the Court held that this did not show that the surrender documents were without free exercise of their own volition. Id. at 225.
¶ 21. In the case sub judice, testimony indicated that other options were made available to M.M. For example, M.M.'s father testified that he never threatened M.M. and that there were other relatives with whom she could have lived. She was given the opportunity to go live with her grandmother and possibly with an aunt in Louisiana. M.M.'s father testified that these options were discussed in M.M.'s presence. Additionally, Roberts testified that "I asked if there were other options that [M.M.] might have about her baby, and [M.M.'s mother] and [M.M.] and [M.M.'s sister] all told me that she could go to Louisiana to live with a relative and take the baby. [M.M.'s sister] even offered to go to Louisiana and take the baby to raise the baby. [M.M.] and [M.M.'s sister] also told me that their [maternal grandmother] in Oxford had offered to let her come there and stay. [M.M.] said she didn't want to go anywhere other than home."
*982 ¶ 22. M.M.'s father was seated on a sofa on the other side of the room when the papers were signed. Additionally, M.M. was made aware that adoption was her decision and was repeatedly asked if she understood what she was signing. As M.M. began to sign the surrender, her older sister asked M.M. if this was really what she wanted to do. This again indicates that the decision was M.M.'s to make. M.M. testified that she looked at her sister and "I told her yeah and continued signing." M.M. also testified that she understood that adoption was permanent.
¶ 23. For all of the foregoing reasons, we find that M.M. did not sign the surrender under undue influence from her father. M.M. was aware that adoption was final and that she had other options. Although these options may not have been appealing to M.M. at age 16, they were available. When M.M. was asked if anyone bribed or threatened her into signing the papers, she answered "[n]o, sir."
¶ 24. "A written voluntary release, or consent by the parent, terminates the parental rights and thereafter, no objection to the adoption from the natural parent may be sustained." Grafe v. Olds, 556 So.2d at 694. Finding that the surrender complied with the statutory requirements of Miss.Code Ann. § 93-17-9, and finding no evidence in the record of undue influence, we conclude that the chancellor did not err in ruling that the surrender of parental rights was valid.

II.
¶ 25. The second issue presented to this Court is whether the constitutional rights of M.M. were violated due to the fact that a guardian ad litem was not appointed on M.M.'s behalf? In an order dated January 11, 1999, the chancellor set a hearing on the legal sufficiency of the "Surrender." In that order, the chancellor stated that "[a]ll other issues shall be held in abeyance pending the outcome of the hearing on May 10, 1999."
¶ 26. In the chancellor's subsequent opinion, he only addressed whether the surrender of parental rights was valid. Again, the chancellor specifically stated in his opinion that "[t]he only issue dealt with in this opinion is the validity of M.M.'s surrender of J.M.M. All other issues are held in abeyance pending further hearings in this cause." There is nothing in the record to show that the remaining issues were ever heard or addressed by the chancellor. This Court has held that "[i]t is an elementary and familiar rule that we sit to review actions of the lower courts, and we will not undertake to consider matters which do not appear of record in the lower court, absent unusual circumstances." Cossitt v. Federated Guar. Mut. Ins. Co., 541 So.2d 436, 446 (Miss.1989). In Cossit, there was nothing in the record that indicated that a particular issue had been raised, developed, or decided by the lower court. Id. For this reason, the Court held that the issue was not properly before it. Id. In the case sub judice, the chancellor never ruled on whether a guardian ad litem should have been appointed for M.M., a minor. The affirmative duty was upon M.M. to bring to the chancellor's attention that he had failed to rule on her motion for appointment of a GAL and to request a hearing on this issue. She failed to do so. The issue is thus procedurally barred.
¶ 27. Alternatively, procedural bar notwithstanding, the merits of the issue will be addressed. Miss.Code Ann. § 93-15-103(2) states that "[t]he rights of a parent with reference to a child, including parental rights to control or withhold consent to an adoption, and the right to receive notice of a hearing on a petition for adoption, may be relinquished and the relationship *983 of the parent and child terminated by the execution of a written voluntary release, signed by the parent, regardless of the age of the parent." Miss.Code Ann. § 93-15-103(2)(Supp.2000) (emphasis added). Also, the purpose of the three-day waiting period required by § 93-17-5 is to protect a biological parent against a hasty decision. As the chancellor noted in his opinion, "[t]he applicable statutes clearly and specifically allow for young parents to surrender their parental rights." Although this issue is procedurally barred from review, in the alternative, it is without merit.

CONCLUSION
¶ 28. Emotional strain is not sufficient to allow M.M. to revoke her consent. The documents were executed in compliance with Miss.Code Ann. § 93-17-9. M.M. had the burden to prove by clear and convincing evidence that her consent was made because of fraud, duress, or undue influence. She did not satisfy that burden as testimony showed that other options were available to her. Next, the chancellor did not address whether a guardian ad litem should have been appointed for M.M., a minor herself. Alternatively, our statute clearly allows for minors to relinquish their parental rights. This Court has never held that a guardian ad litem should be appointed to protect the interests of a minor parent. The surrender of parental rights was valid, and the chancellor's judgment is, therefore, affirmed.
¶ 29. AFFIRMED.
PITTMAN, C.J., MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J.
McRAE, P.J., dissenting:
¶ 30. M.M. (the mother) was sixteen years of age when the adoption of her son was finalized, a mere twenty five days after she gave birth to J.M.M. The majority not only finds no error in the chancellor's failure to rule upon her motion for appointment of a guardian ad litem during the adoption proceeding, but goes further to find the issue waived because she failed to remind the court that it had not ruled on the motion. We have consistently held that minors can not waive their rights in civil proceedings. Adoption agencies as well as prospective adoptive parents must therefore be very leery of this fact when they are dealing with minors. Accordingly, I dissent.
¶ 31. In the case at bar the mother moved the court to appoint a guardian ad litem on her behalf. The chancellor held the issue in abeyance pending further hearings and then failed to rule on it. The majority states that "[t]he affirmative duty was upon M.M. to bring to the chancellor's attention that he had failed to rule on her motion for appointment of a GAL and to request a hearing on this issue. She failed to do so. The issue is thus procedurally barred."
¶ 32. This holding flies in the face of our long-standing jurisprudence that a minor can not waive her rights. The burden was on the court, not on the mother, to secure her rights by the appointment of a guardian ad litem. The present case illustrates exactly why we require the appointment of guardians ad litem to protect the rights of minors: they are not capable, as a matter of law, of protecting their own rights.
¶ 33. For well over a century, this Court has afforded special protection to the rights of minors. Price v. Crone, 44 Miss. 571 (1870). "The rights of an infant will not be permitted by the court to be *984 prejudiced by any omission of the guardian ad litem" Id. at 577. Furthermore:
The court must look to the record and all its parts, to see that a case is made which will warrant a decree to bind and conclude her interest, and of its own motion, give to the minor the benefit of all objections and exceptions, as fully as if specially made in pleading ... There being no power in the infant to waive anything....
Id. at 575-76 (emphasis added).
¶ 34. In Alack v. Phelps, 230 So.2d 789, 792-93 (Miss.1970), we held that "children are under the disability of minority and cannot act for themselves. The equity court will protect their rights." In that case, two children, adopted by their grandparents, were allowed to bring suit through their guardian for the wrongful death of their natural father, even though the tortfeasor had already reached a settlement with the estate of the deceased father. See also Khoury v. Saik, 203 Miss. 155, 162, 33 So.2d 616, 618 (1948) (holding that "minors can waive nothing. In the law they are helpless, so much so that their representatives can waive nothing for them....")
¶ 35. In order to protect children, case law and statutory law have consistently provided that minors do not have the capacity to legally consent. Minors are considered incapable of making such decisions because of their lack of emotional and intellectual maturity. Furthermore, minors cannot enter into contracts, buy or sell real property, vote, own a house, or even choose the parent with whom they care to live when their parents divorce. In Edmunds v. Mister, 58 Miss. 765 (1881) this Court held that when contracts for the sale of land are made by minors, they are voidable at the option of the minor. Generally, an infant has the right to disaffirm a contract of purchase of land even though it has been executed. 43 C.J.S. Infants § 138, at 405-06 (1978). In fact, a minor in Mississippi does not even have the capacity to bind himself absolutely to a contract. See Shemper v. Hancock Bank, 206 Miss. 775, 778, 40 So.2d 742, 744 (1949)(minor did not assume liability in a partnership because the partnership was a contractual relationship in which the minor had no capacity to enter). See also Miss. Code Ann. § 93-19-13 (1994) (allowing only those individuals eighteen years of age or older to contract); Miss.Code Ann. § 15-3-11 (1995) (setting forth statutory steps for person of majority to ratify contract entered into as minor).
¶ 36. For example, Miss.Code Ann. § 97-3-65(1)(b)(2000) makes it a crime for a person of any age to have sexual intercourse with a child who is under the age of fourteen or who is twenty-four or more months younger than the person. The offender is held accountable regardless of the minor's consent or lack of chastity. Id. § 97-3-65(c). There further is a proscription against the fondling of a child under the age of sixteen years by a person over the age of eighteen years "with or without the child's consent." Miss.Code Ann. § 97-5-23(1) (2000). Section 97-5-23(2) creates a separate offense where the child is under the age to eighteen years in those instances where the offender "occupies a position of trust or authority over the child."
¶ 37. In recognition of minors' relative inability to act maturely on their own behalf, courts also give special protection to minors in the law of adverse possession. The ten-year term provided in our adverse possession statute simply "does not begin to run against minors until the disability of minority has been removed." Wilder v. Currie, 231 Miss. 461, 483, 95 So.2d 563, 571 (1957); Miss.Code Ann. § 15-1-7 (1995). Likewise, the statute of limitations *985 for a minor to bring a personal action is tolled until the disability of minority is removed. Miss.Code Ann. § 15-1-59 (1995). This Court also recognizes the disability and waits until minority is removed to permit the time for taking an appeal to run. M.R.A.P. 4(f). Even when the minor has a guardian ad litem, he is given two years within which to file his appeal to this Court instead of the normal thirty days.
¶ 38. To allow a sixteen-year-old to forfeit her rights to motherhood without so much as appointing a guardian ad litem is to invite unconscionable injustice. The record shows that the mother unwillingly broke the news of her pregnancy to her parents on the same day that she gave birth. Only then was New Beginnings of Tupelo, Inc., contacted, and twice on this same day its agents visited the mother at her bedside. The next day, as she was discharged, a New Beginnings employee met her in the parking lot of the hospital and took custody of J.M.M. The following day, three days after both giving birth, and breaking the news to her parents, the mother signed the document surrendering her parental rights and consenting to the adoption. Less than 30 days later, the adoption was finalized.
¶ 39. The mother was sixteen years of age when the final decree of adoption was entered on March 21, 1997, a scant 25 days after the birth of J.M.M. At this time, she was not even old enough to be entitled to watch an R-rated movie. How can we say that she was mature enough to permanently surrender any right to participate in the life of her child, when at the same time we prevent her from viewing fictional cinema that depicts "adult situations"? I can think of fewer situations more adult that the permanent surrender of one's child to perfect strangers.
¶ 40. The history of jurisprudence in this state places a duty on the chancery court, on its own motion, to appoint guardians ad litem to protect the interests of minors. Given the facts at bar, it is clear that the chancellor should have appointed a guardian ad litem for the mother during the adoption proceeding. If a minor can revoke a contract for the sale of land, as well as practically any other business contract, surely under the facts of this case a guardian ad litem should have been appointed. The chancellor erred in allowing a sixteen-year-old to irrevocably surrender her parental rights only twenty-five days after giving birth, without the proper safeguards in place. Accordingly, I dissent.
BANKS, P.J., JOINS THIS OPINION.