CARLSON, Justice, for the Court.
¶ 1. Aggrieved by the Clarke County Chancery Court’s dismissal of their complaint to revoke consent and for custody of minor child and its judgment granting a permanent adoption of the minor child to the adoptive parents, the natural mother and maternal grandmother of the adopted child have appealed to this Court seeking relief. Finding no error by the chancellor, we affirm.

FACTS AND PROCEEDINGS IN THE TRIAL COURT

[1]

¶ 2. D.N.T. (Diane),[2] born September 8, 1999, is the daughter of C.M.T. (Camille), born August 26, 1983. In January 1999, Camille, who was hardly unaccustomed to living in various places for short periods of time,[3] became pregnant while living with D.W.P. (Dan) in Lufkin, Texas.[4] After Camille became pregnant, she moved back to Yuma, Arizona, to live with her mother, S.T. (Sally); however, Camille soon returned to Texas in an effort to make amends with Dan and to stay with her *694 father, C.R.T. (Curt). Within a few days after her sixteenth birthday, Camille gave birth to Diane in Llano, Texas,[5] where she had been living with her father for about five months prior to Diane’s birth. When Diane was born, her father (Dan) was living in Llano. Camille and Diane remained in Texas with Camille’s father, for about two and a half months after Diane’s birth, at which time Camille and Diane returned to Yuma, Arizona, on approximately November 17, 1999, to resume living with Sally.
¶3. Camille had received prenatal care in both Arizona and Texas, and she had relied on her mother for support during the pregnancy and after the birth of the child. Diane’s father (Dan) never supported Diane and rarely called to check on the child. Dan and Camille never married, and Dan never took legal action to be recognized as Diane’s father.
¶ 4. By going to a store in Yuma, Arizona, and purchasing a packet, Sally, Diane’s maternal grandmother, established a “do-it-yourself’ guardianship in Arizona, whereby Sally became the “guardian” of Diane. This guardianship, was established so that Diane could benefit from Sally’s insurance coverage. These “do-it-yourself papers” were filed by Sally and Camille with the Yuma County Clerk’s Office in October 2000. This guardianship was established without consultation with an attorney. Camille testified that she took this action because “I wanted a responsible adult to have guardianship of Diane and my mother could put her (Diane) on her insurance if she was listed as a dependent.” When asked at the second hearing if the guardianship was established through the Arizona courts, Sally testified that the guardianship “was awarded by the court,” but that she and Camille had purchased the legal packet from a store, completed the papers, and filed the papers with the court. From the totality of the record, as more fully discussed later in this opinion, we are able to conclude that a judge entered an order appointing Sally as Diane’s guardian though no documentation appears in the record regarding the guardianship papers. This “guardianship” was still in effect when Camille and Diane came to Mississippi.
¶ 5. Camille and Diane left Arizona for Mississippi approximately one week before Christmas 2000, for the purpose of visiting Camille’s father (Curt), who had by that time moved from Texas to Wesson, Mississippi. Camille stated that she wanted her father to “get to know his granddaughter.” Camille testified that at the time she left Arizona, she planned to return Diane to Sally’s home in Yuma, Arizona, in mid-January 2001, and that although she came to visit in Mississippi, she felt like she would “end up back in Arizona.”
¶ 6. Camille stayed with her father for one week, but then she met C.A.H. and R.D.H. (Carol and Rick), on Christmas Day 2000, and Camille and Diane promptly moved in with Rick and Carol in Stonewall, Clarke County, Mississippi. Camille lived with Rick and Carol from Christmas 2000, through the time the adoption petition was filed in March 2001, and Camille relied on Carol for support. In addition, Carol’s mother and Camille’s father (Curt) lived together.[6] Neither Camille nor Diane had ever been to Mississippi before, and Camille said it was “not necessarily” her intention to become a Mississippi resident. *695 Instead, Camille supposedly came to Mississippi in hopes of finding temporary work as a tax secretary during tax season and to let her father spend time with Diane. Camille testified that she did not always stay with Rick and Carol at night, but that she was there during the day.[7] While Camille was away at night, Carol would keep Diane. At the time of the chancery court hearing, Diane had lived continuously with Rick and Carol for several months, and Rick and Carol had fully supported her.
¶ 7. Around January 10, 2001, Carol helped Camille write a letter to a judge in Arizona to terminate the guardianship Sally and Camille had established. Camille testified she took efforts to terminate the guardianship “so Carol could adopt Diane.” On the other hand, Sally testified she never intended to relinquish any rights over Diane when Camille went to Mississippi. The Arizona guardianship over Diane was judicially terminated on or about February 14, 2001.
¶ 8. On March 8, 2001, Rick and Carol filed in the Chancery Court of Clarke County, Mississippi, a sworn Complaint for Adoption, also signed under oath by Camille; however, on March 23, 2001, Camille filed an Objection to Proceedings, requesting the chancery court to “set aside, cancel and hold for naught any documents [she] signed or executed in anticipation of the [adoption] matter.” Notwithstanding the objection filed by Camille, the chancellor entered a temporary judgment of custody in favor of Rick and Carol on April 2, 2001. On April 6, 2001, Camille and Sally, through counsel, filed a Complaint to Revoke Consent and For Custody of Minor Child, wherein they asserted, inter alia; (1) that Camille’s joinder in the adoption proceeding was a nullity because (a) the chancery court lacked jurisdiction pursuant to the Mississippi Uniform Child Custody Jurisdiction Act (UCCJA), (b) Camille lacked the legal capacity to join in or commence any legal proceeding, and (c) Sally had not been joined as a party; and (2) that Camille should be allowed to withdraw and revoke her consent and joinder in the adoption complaint because (a) at the time of the execution of the adoption complaint and joinder, Camille was subjected to “undue influence, duress and intimidation,” (b) Rick and Carol, in order to get Camille to sign the adoption papers, fraudulently misrepresented that after the adoption, they would allow Camille unlimited time with Diane and would not do anything to alienate Diane from Camille, (c) Camille believed that the same attorney was representing her and Rick and Carol, (d) Camille did not understand that a court could refuse to allow her to withdraw her consent to adoption, '(e) her immaturity and inexperience caused her to be unable to comprehend the import of what she was doing when she signed the adoption consent, and (f) it was not in Diane’s best interest for Camille to have her rights as natural mother permanently terminated.
¶ 9. After hearing oral arguments on April 25, 2001, on the sole issue of jurisdiction, the chancellor, on May 3, 2001, entered a detailed eleven-page Memorandum Opinion and Ruling on Jurisdiction, wherein she held, inter alia, that the Clarke County Chancery Court had jurisdiction in the case, pursuant to the UCCJA, and more specifically, pursuant to Miss.Code Ann. § 93-23-5(l)(c). The chancellor fur *696 ther held that the case was a contested adoption and that a Guardian ad Litem must be appointed; therefore, an order appointing a Guardian ad Litem was entered on May 11, 2001. See Miss.Code Ann. § 93-17-8. The case was set for trial on September 5, 2001.
¶ 10. As scheduled, the chancellor conducted a hearing on September 5, 2001, and immediately thereafter handed down her bench opinion which was reduced to a written “Bench Opinion and Judgment” signed on September 5, 2001, and filed on September 7, 2001. Based on the evidence presented, the chancellor held, inter aha, that Camille was not the victim of undue influence or fraud and granted the Miss. R. Civ. P. 41(b) motion offered, ore tenus, by counsel for Rick and Carol. A Motion for Relief Pursuant to Rules 59 and 60, Miss. R. Civ. P., was filed on September 13, 2001, wherein Sally and Camille renewed their motion to dismiss for lack of jurisdiction and averred that the Court’s final judgment of September 7, 2001, did not include the ruling on the motion to dismiss for jurisdictional reasons. An order dated September 28, 2001, amended the final judgment by adding the following language to the bench opinion: “At the outset of trial in this case, Camille and Sally, by and through their attorney, renewed their motion to dismiss for lack of jurisdiction, pursuant to the Mississippi Uniform Child Custody Jurisdiction Act. Having been fully advised in the premises, the Court finds that the motion is not well taken, and the motion is overruled.” A Notice of Appeal was filed by Camille and Sally on October 5, 2001, a Designation of Record was likewise filed on October 5, 2001, and a Certificate of Compliance was filed on October 12, 2001.
¶ 11. Interestingly, the Judgment of Adoption was not filed until November 6, 2001, some thirty-two (32) days after the filing of the Notice of Appeal. The Judgment of Adoption was signed by the chancellor, and dated September 5, 2001 (the same day of the hearing and the signing of the “Bench Opinion and Judgment”), but with the notation “nunc pro tunc.”[8] While the chancellor most definitely had the inherent power and authority to enter this nunc pro tunc judgment of adoption effective back to the date of the hearing and her oral pronouncements from the bench on these issues, the date of filing is critical for the purposes of appeal. Any appeal to this Court is perfected by the filing of the notice of appeal pursuant to M.R.A.P. 3(a) within “30 days after the date of entry of the judgment or order appealed from” pursuant to M.R.A.P. 4(a). Therefore, the notice of appeal as to the judgment of adoption was prematurely filed since the notice of appeal was filed on October 5, 2001, and the judgment of adoption was not “entered” until November 6, 2001. However, this defect is cured by the provisions of M.R.A.P. 4(b), which states:
(b) Notice Before Entry of Judgment. A notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day of the entry.
Therefore, since the chancellor had the inherent authority to enter the nunc pro tunc judgment of adoption so that the trial court records would “speak the truth,” and because the judgment of adoption indeed *697 reduced to writing the decision which had already been announced on September 5, 2001, the provisions of M.R.A.P. 4(b) appropriately allow the notice of appeal in this case to be treated as filed after the entry of the judgment of adoption.

STANDARD OF REVIEW

¶ 12. Whether the chancery court had jurisdiction to hear a particular matter is a question of law, to which this Court must apply a de novo standard of review. Burch v. Land Partners, L.P., 784 So.2d 925, 927 (Miss.2001) (citing Saliba v. Saliba, 753 So.2d 1095, 1098 (Miss.2000); Entergy Miss., Inc. v. Burdette Gin Co., 726 So.2d 1202, 1204-05 (Miss.1998)).

DISCUSSION

I. WHETHER MISSISSIPPI HAD JURISDICTION TO GRANT THE ADOPTION AND WHETHER THE UNIFORM CHILD CUSTODY JURISDICTION ACT (Miss. Code Ann. § 93-23-1 et seq.) APPLIES TO AN ADOPTION PROCEEDING.
¶ 13. A critical issue in this case is whether this Court will apply the Uniform Child Custody Jurisdiction Act, Miss.Code Ann. §§ 93-23-1 et seq. to adoption cases. While the parties briefed this issue as a case of first impression, this Court, subsequent to the submission of the parties’ briefs in the case sub judice, decided In re Adoption of C.L.B., 812 So.2d 980 (Miss.2002). In C.L.B., we held that “[cjonsen-sual adoptions where all parties are present do not fall within the meaning of a custody proceeding as envisioned by the UCCJA.” Id. at 985. In C.L.B., both natural parents consented to the adoption of their infant child by the child’s paternal grandparents, while here the natural mother initially consented to the adoption, but later attempted to withdraw her consent; the natural father was not involved; the guardian-maternal grandmother objected; the maternal grandfather acquiesced in the adoption; and, the natural mother, joined by the guardian-maternal grandmother, filed in the same cause a complaint to revoke the natural mother’s consent and to restore permanent custody of the infant child to the natural mother. In C.L.B., the natural mother claimed that the UCCJA applied and that since the adoptive parents failed to attach the required UCCJA residency affidavit to the petition for adoption, the chancery court had not acquired jurisdiction of the adoption and the judgment of adoption was thus void. Likewise, in the case today, the natural mother and maternal grandmother, in attempting to have the adoption judgment set aside, are asserting the applicability of the UCCJA in an effort to have this Court determine that the adopting parents’ failure to attach the UCCJA residency affidavit to the adoption petition is fatal because it divested the chancery court of jurisdiction to hear the case. Additionally, the natural mother and maternal grandmother assert that Arizona, not Mississippi, is the home state of the child and that the child had not lived in Mississippi for the requisite six (6) months under the UCCJA, thereby defeating jurisdiction in the Mississippi courts.
¶ 14. In C.L.B. this Court reviewed the issue of the applicability or non-applicability of the UCCJA to adoption proceedings as revealed in cases from other jurisdictions, and concluded that the UCCJA would not be applied to consensual adoptions where all parties are present.
¶ 15. However, the case before us today presents a little different twist on this issue. In C.L.B., the natural parents, the adoptive parents, and the adopted child were all Mississippi residents. In the case sub judice, the adoptive parents are Mis *698 sissippi residents, but the natural mother, guardian-maternal grandmother, and the adopted child were deemed to be nonresidents of Mississippi at the time of commencement of the trial court proceedings. Likewise, in C.L.B., the natural mother launched a post-judgment attack on the validity of the adoption, meaning that since the adoptive parents had custody pursuant to a final judgment of adoption, there was no issue of custody of the infant child pending the trial court proceedings on the post-adoption petition to set aside the adoption. On the other hand, in our case today, the complaint for adoption was filed on March 8, 2001, and before any court action had been taken on the adoption pleadings, Camille, through counsel, filed her “Objection to Proceedings” thereby seeking to withdraw her joinder in the adoption pleadings and further seeking return of Diane to her. This put the chancellor on notice of the fact that she was now dealing with a contested adoption; therefore, the chancellor, on April 2, 2001, entered a temporary judgment of custody awarding the temporary custody of Diane to Rick and Carol, but with “reasonable visitation rights” being awarded to Camille. On April 6, 2001, Camille and Sally, through counsel, filed their Complaint to Revoke Consent and for Custody of Minor Child, seeking, inter alia, a nullification of Camille’s joinder in the adoption proceedings due to alleged non-compliance with the UCCJA and an award of permanent custody of Diane to Camille. By this time, the learned chancellor obviously knew that she had a full-scale war on her hands as to who would end up with custody of Diane— Rick and Carol, Camille, or Sally. Additionally, since there was no final judgment of adoption; since the sought-after adoption of Diane was hotly contested; since there was no entry of a custody order other than the “until-further-order-of-the-court” temporary custody order; since Diane, Camille, and Sally were Mississippi non-residents; since there was a claim that Mississippi was not Diane’s home state; since there was a claim that Sally should have been joined in the adoption proceedings; since there was reference to Sally’s Arizona guardianship of Diane; since there was then before the chancellor a complaint for adoption by Rick and Carol and a complaint to revoke the adoption consent and for permanent custody of Diane by Camille, through Sally; since Rick and Carol through their pleadings appeared to have satisfied the jurisdiction and venue requirements of the applicable adoption statute, Miss.Code Ann. § 93-17-3(1); and, since it appeared that this case had become one involving potentially protracted litigation, the chancellor was confronted with an issue not confronted by the chancellor in C.L.B. — what to do with the child in the meantime?[9] To this end, the chancellor conducted a hearing solely on the issue of whether the UCCJA applied to an adoption proceeding, and at the conclusion of the hearing, the chancellor took this issue under advisement and later rendered an eleven-page Memorandum Opinion and Ruling on Jurisdiction. In her ruling, the chancellor determined that the UCCJA did apply in the adoption proceeding; however, contrary to the position of Camille and Sally that the application of the UCCJA defeated the jurisdiction of the chancery court, the chancellor held that *699 the application of the UCCJA conferred jurisdiction upon the chancery court.
¶ 16. The chancellor referred to the adoption statutes, including Miss.Code Ann. §§ 93-17-8, 93-17-11, and 93-17-13, which refer to orders of custody and interlocutory decrees. Accordingly, after a meticulous review of the UCCJA provisions, the chancellor opined that since the Mississippi adoption statutes did refer to the issue of custody, the UCCJA applied.[10] Based on the facts and circumstances of this particular case, we uphold the chancellor’s application of the UCCJA at the April 25, 2001, pre-adoption hearing, but for reasons different than those stated by the chancellor. In so doing, we emphasize here that the decision today is in no way inconsistent with our decision in C.L.B., as will be hereinafter discussed. Additionally, we find that the UCCJA has only limited applicability in adoption cases.
¶ 17. Souza v. Superior Court, 193 Cal.App.3d 1304, 238 Cal.Rptr. 892 (1987), provides an excellent discussion of the UC-CJA as it relates to adoption proceedings. In Souza, the California Court of Appeal, Sixth District, reversed the trial court’s refusal to apply the UCCJA and the Federal Parental Kidnapping Prevention Act (PKPA) to an adoption proceeding. In Souza, the parents of a minor child had divorced in Hawaii, and the Hawaii state court had reserved jurisdiction over child custody and visitation. After moving to California with the minor child, the mother remarried and the mother and stepfather of the minor child filed a stepparent adoption petition in the Santa Cruz County Superior Court. After being served with the adoption papers, the father filed a motion for visitation in the Hawaii Family Court, which issued a show cause order. The father’s attorney conveyed the nature
of this Hawaii state court action to the California state court, which refused to honor the Hawaii state court order. In reversing this action of the trial court, the California Court of Appeal, in citing a California statute, stated that “[t]he general basis for jurisdiction under the UCCJA, absent conflict of court considerations, is presence of the child and significant connection with the forum state.” 193 Cal.App.3d at 1308, 238 Cal.Rptr. at 894 (emphasis added). The Souza court went on to state:
[The stepfather] argued in the Santa Cruz court that the UCCJA standards do not apply in an adoption proceeding. This argument is clearly wrong. The UCCJA regulates custody of children. An adoption proceeding to terminate parental custody rights is clearly a custody-determining proceeding of the most drastic kind.
[[Image here]]
Patently, a stepparent adoption, with its potential for completely terminating the natural father’s custodial rights, is a custody-determining procedure and is equally subject to the UCCJA and the PKPA.
[[Image here]]
Here, however, the Hawaii court had original subject matter jurisdiction; no one questions the validity of the initial decree.The only orderly procedure avoiding a conflict of state rulings is to require [the mother] to challenge the Hawaii court’s assumption of jurisdiction by direct attack in that proceeding. ... So here, both the initial and the modifying decrees of the Hawaii court, being regular on their face are not subject to collateral attack in a California forum.
*700 193 Cal.App.3d at 1309-11, 238 Cal.Rptr. at 895-97. The end result in Souza was that the California appellate court issued a writ of mandate to the trial court, directing that court “to either (1) stay the action pending resolution of the custody proceeding now pending in Hawaii and cooperate with the Hawaii court in connection with that proceeding or (2) dismiss the adoption proceeding entirely.” 193 Cal.App.3d at 1312, 238 Cal.Rptr. at 897.
¶ 18. We also have guidance from decisions of this Court. In Curtis v. Curtis, 574 So.2d 24 (Miss.1990), this Court was confronted with a case of parental kidnapping. A married couple had eight children from their union. When the couple was living in Utah, the wife/mother obtained a divorce from the husband/father in a Utah state court. At a time when both parents still lived in Utah, the father sought and received permission from the mother, the custodial parent of the four youngest children, to have visitation with the four children for the long President’s Day weekend. Instead, the father took off to Mississippi with the children, ending up with a friend in Pearl. Thereafter, the father filed a complaint in the Scott County Chancery Court, seeking modification of the Utah custody decree and a protective order under the Mississippi Protection From Domestic Abuse Law, Miss. Code Ann. §§ 93-21-1, et seq. (PDA), based on a claim of child abuse on the part of the mother. The Mississippi chancellor entered an ex parte order granting the father the temporary custody of the children. Thereafter, with Mississippi counsel, the mother attacked the jurisdiction of the Mississippi courts pursuant to the UCCJA and the federal PKPA. After several months, the Mississippi chancellor acknowledged his inability under the PKPA to modify the Utah custody decree, but the chancellor did allow his custody order to remain in effect in behalf of the father pursuant to the PDA. There are many more intriguing facts of this case which simply need not be stated here for the purpose of this discussion.
¶ 19. We do find of benefit the following language in Curtis:
This case presents a classic case of the parental and judicial behavior the statutes were designed to and do proscribe. A valid Utah decree granted custody of four children to their mother. Ten weeks later, the father took advantage of his weekend visitation and wrongfully brought the children to Mississippi and enlisted the aid of this state’s courts to give him custody. The children have since been caught in the middle of a tug of war.
We hold the Utah courts never lost jurisdiction of the matter of the permanent custody of the children. With this we adjudge the legal issues tendered. In doing this almost three years after the fact, we have no illusion that we have ability to put Humpty Dumpty back together again. We hope from this fall all may know of our seriousness of purpose that the law’s injunction be respected.
[[Image here]]
Having in mind the dominant purpose of the UCCJA to prevent interstate parental kidnapping, and particularly Section 93-23-15’s strong injunction against wrongfully taking children from one state to another, this jurisdictional requisite may only sensibly be read to require that [the father] and children “have a significant connection” with Mississippi prior to filing the application for custody modification.
[[Image here]]
In sum, we hold that the Chancery Court of Scott County correctly assumed temporary emergency jurisdic *701 tion back on February 16, 1988. On the other hand, that Court erred when it continued to exercise subject matter jurisdiction over this matter after it should reasonably have become apparent that there was no clear and present danger to the children from permitting adjudication of modification, if any, of their custody in the courts of the State of Utah.
574 So.2d at 25, 30-31 (emphasis added).
¶ 20. We have admittedly gone to great lengths to discuss the UCCJA and its proper use in Mississippi adoption cases. The common thread which runs through these UCCJA cases from Mississippi and other jurisdictions is that the UCCJA was enacted primarily to prevent interstate parental kidnapping. Our Mississippi trial courts, and ultimately our appellate courts, must especially look to the possible application of the UCCJA provisions in contested adoption cases if it appears that there might be a possible conflict with a foreign court already exercising continuing jurisdiction over the matter. Certainly, in the case before us today, there was not an issue of “interstate parental kidnapping,” but there was the initial issue of whether the Arizona courts had already asserted jurisdiction in this matter by way of Sally’s guardianship over Diane. On the other hand, the UCCJA is not to be indiscriminately used by attorneys as a sword to attempt to improperly obtain or defeat jurisdiction in our Mississippi courts. Likewise, our learned Mississippi trial judges should be sparing in their application of the UCCJA to contested adoption cases. However, as in the case today, the chancellor correctly utilized the UCCJA provisions, though for reasons different than ours. In the case today, we find that the chancellor had a right to apply the UCCJA provisions at the April 25, 2001, hearing (1) so as to inquire further about the purported Arizona guardianship to determine if the Mississippi courts should yield to the Arizona courts on the issue of Diane’s custody, and, if it were determined (as was the case) that the guardianship had been terminated and that no other foreign court was asserting jurisdiction over the custody of Diane, then, additionally (2) so as to inquire about the application of the jurisdictional provisions of the UCCJA.
¶ 21. Miss.Code Ann. § 93-23-5 (Supp. 2002) (the jurisdictional portion of the UC-CJA) states:
(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
(a) this state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child’s home state within six (6) months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or
(b) it is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one (1) contestant, have a significant connection with the state, and (ii) there is available in this state substantial evidence concerning the child’s present or future care, protection, training and personal relationships; or
(c) the child is physically present in this state and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or *702 threatened with mistreatment or abuse or is otherwise neglected or dependent; or
(d)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b), or (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.
(2) Except under paragraphs (c) and (d) of subsection (1) of this section, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.
(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.
¶22. In Laskosky v. Laskosky, 504 So.2d 726 (Miss.1987), this Court declined jurisdiction under the UCCJA over a custody dispute involving a child who was a Canadian citizen and who was in Mississippi with his mother. The child was only in Mississippi because the mother, who was a native Mississippian, fled Canada to prevent her estranged Canadian husband from having custody of the child. We wrote:
Courts should also decline jurisdiction when a foreign nation’s court has continuing jurisdiction over the matter, and when the foreign court is a more appropriate and convenient forum. Miss. Code Ann. § 93-23-11 (Supp.1985). Courts should also decline jurisdiction when the child had not resided in the jurisdiction for a sufficient period of time. MCA § 93 — 23—5(1)(a) (Supp. 1985).
504 So.2d at 731 (case citations omitted).
¶ 23. Turning to the case sub judi-ce, we first of all address Miss. Code Ann. § 93-23-11, which was cited by this Court in Laskosky.[11] We do so because of the prior reference to the Arizona guardian *703 ship established over Diane by Sally. As already mentioned, there is no exhibit in the record to document the establishment of the Arizona guardianship; and likewise, the record does not reveal any exhibit to document the termination of the guardianship. The record does reveal that at the first hearing of April 25, 2001, the letter of January 10, 2001, was received into evidence through Camille’s testimony and referred to by both Camille and Carol during their testimony at that hearing; however, the letter itself is not a part of the record before this Court. Fortunately, however, we do have considerable testimony from Camille and Sally concerning the termination of the guardianship. Camille testified at the second hearing that she told the Arizona judge on two different occasions that she wanted to have the guardianship terminated, and that this decision was her decision without any coercion on the part of Carol or Rick. Sally testified at the second hearing that in late January or early February 2001, she received copies of the papers indicating that Camille was attempting to have the guardianship terminated. In fact, Sally personally appeared before an Arizona judge on two different occasions. On the first occasion in early February 2001, the judge had Sally before him and Camille on a speaker phone, but at that time, he refused to terminate the guardianship when he realized that Sally and Camille were unrepresented and the judge suggested to Sally that she seek the advice of an attorney. Accordingly, the judge reset the hearing for a future date so that Sally could have the opportunity to confer with an attorney. When asked if she heeded the Arizona judge’s advice to contact a lawyer, she responded that she did not. According to Sally, she then appeared a second time before the same judge in early March 2001, at which time she went to the judge’s chambers where a hearing was conducted with the judge and her in the judge’s chambers, and Camille on a speaker phone.[12] Sally testified at the second hearing in the case sub judice that she was appearing before the Arizona judge at that hearing because “[she] was protesting the revocation of the guardianship.” However, the Arizona judge did revoke the guardianship and both Sally and Camille received copies of the judge’s “final judgment” terminating the guardianship.
¶ 24. So, in the end, while we have no official Arizona court documents in the record to aid us in reviewing the establishment and termination of the Arizona guardianship, we are satisfied from the testimony of Camille and Sally that the Arizona guardianship was judicially terminated, and that Camille and Sally were afforded their due process rights in the Arizona guardianship termination proceedings. See Ariz.Rev.Stat. § 14-5212 (1975); In re Guardianship of Mikrut, 175 Ariz. 544, 858 P.2d 689, 693 (Ariz.Ct.App.1993) (A guardianship, established by consent of the natural parent is terminable upon revocation of that consent.). Accordingly, we are bound to give full faith and credit to the Arizona judgment terminating Sally’s guardianship over Diane. See U.S. Const. Art. IV, § 1. Since the Arizona guardianship had been terminated, and since there was no evidence of other pending proceedings in foreign courts concerning custody of Diane, Miss.Code Ann. § 93-23-11 does *704 not prohibit assertion of jurisdiction by the Mississippi courts.
¶ 25. As to Miss.Code Ann. § 93-23-5, also discussed in Laskosky, it could possibly appear at first blush that the statute denies jurisdiction to the Mississippi courts in this case. Mississippi is not Diane’s home state, nor had she been in Mississippi the required six months previous to commencement of these proceedings, as the proceedings commenced with the filing of the Complaint for Adoption on March 8, 2001. According to Camille’s testimony, she and Diane, arrived in Mississippi, for the first time ever, about a week before Christmas 2000. However, as the chancellor found, Diane was effectively abandoned by Camille. On this issue, the chancellor made a clear finding in her May 3, 2001, memorandum opinion entered subsequent to the jurisdiction hearing of April 25, 2001, when she stated:
Camille has filed a UCCJA affidavit in connection with her complaint for custody, and the court has taken sworn testimony with regard to all the matters required in the UCCJA affidavit. Although the court is of the opinion that the UCCJA is applicable to this case, this court will not dismiss the adoption proceeding filed by Rick and Carol. Camille executed a joinder in the adoption proceeding, and her action in that regard effected her physical and legal abandonment of her child, thereby giving this court subject matter jurisdiction pursuant to § 93 — 23—5(l)(c).
In other words, the chancellor found that based on the evidence before the court, and pursuant to Miss.Code Ann. § 93-23-5(l)(e)(i), the chancery court had jurisdiction to make a child custody determination as to Diane because Diane was physically present in Mississippi and she had been abandoned.[13] Notwithstanding this April 25, 2001, pre-adoption finding by the chancellor as to UCCJA abandonment pursuant to Camille’s execution of the joinder/waiver, the chancellor certainly could and did eventually consider at the later hearing of September 5, 2001, Camille’s assertion of undue influence, duress and intimidation on the part of Rick and Carol surrounding Camille’s initial consent to adoption.
¶ 26. Finally, in addressing the assertion of Camille and Sally that Rick and Carol’s failure to attach the UCCJA residency affidavit to the adoption complaint deprived the chancery court of subject-matter jurisdiction, inasmuch as this Court has held here that the UCCJA has only limited applicability to contested adoptions in certain cases, the failure to attach the UCCJA § 93-23-17 residency affidavit does not defeat jurisdiction in this case since the chancellor, in her April 25, 2001 pre-adoption ruling, allowed Rick and Carol to adopt Camille’s affidavit which was included in her Complaint to Revoke Consent and for Custody of Minor Child.
¶ 27. In the end, we And that based on the facts and circumstances peculiar to this particular case, the chancellor correctly applied the UCCJA to the pre-adoption determination of Diane’s custody in this contested adoption, though for reasons different than ours. While the chancellor opined that the UCCJA applied to adoptions, whether contested or not, because an adoption permanently changed *705 custody from the natural parent(s) to the adoptive parent(s), this Court, admittedly subsequent to the chancellor’s ruling, laid to rest in C.L.B. any notion that the UC-CJA applied to consensual adoptions where all interested parties were present. On the other hand, when, as here, a chancellor in a contested adoption is called upon to make a pre-adoption determination as to the appropriate custody of the child who is the subject of the adoption proceedings, and there are unresolved issues such as (1) whether other persons might have legal custody of the child because of proceedings in foreign courts; (2) whether Mississippi is the “home state” of the child; (3) whether the child has been abandoned or abused; or, (4) whether all interested parties are present, then the chancellor may appropriately consider the applicability of the UCCJA.
¶ 28. Again, as already noted, our holding today is in no way inconsistent with our decision in C.L.B. wherein we stated:
In addition, all of the cases cited by the natural mother involved custody determinations arising out of divorce or non-consensual adoptions where not all of the interested parties were present. Therefore, those cases were not merely matters of adoption; they also struggled with true custody issues. It is important to note that adoptions were unknown to the common law and exist solely by statute. Eggleston v. Landrum, 210 Miss. 645, 651-52, 50 So.2d 364, 366 (1951). As such, statutes control the manner in which adoptions are conducted, and there is a specific chapter set out in the Mississippi Code which governs and controls adoption proceedings. Subjecting consensual adoptions to the requirements of multiple statutes would only confuse and frustrate the process. In addition, public policy demands that we not subject consensual adoptions to this additional set of requirements. A virtual floodgate of late jurisdictional challenges would open, releasing a deluge of cases on our court system and uncertainty into the home of every adoptive parent. As such, we hold that consensual adoptions in which all interested parties are present are not subject to the provisions of the UCCJA.
812 So.2d at 983 (emphasis added). Because we find that as opposed to the consensual adoption in which all interested parties were present in C.L.B., since in the case sub judice one or more of the necessary factors noted above were present in the case today so as to allow the chancellor to consider and to apply the provisions of the UCCJA, we affirm the chancellor’s decision to apply the UCCJA to the pre-adoption determination of child custody so as to initially acquire jurisdiction in this matter. However, all of this having been stated on the subject, we again emphasize that the UCCJA provisions should not be indiscriminately utilized in adoption cases in an effort to obtain or defeat jurisdiction in our Mississippi courts because our statutes accommodate us well in clearly setting out the jurisdiction and venue requirements in adoption proceedings. See Miss. Code Ann. § 97-17-3. To this end, Rick and Carol had filed their Complaint for Adoption in the Chancery Court of Clarke County, Mississippi and in their adoption pleadings, they alleged under oath that they were adult resident citizens of Clarke County, Mississippi, and had been so residing for “more than ninety days.” There is no doubt that the Clarke County Chancery Court obtained jurisdiction to adjudicate this adoption proceeding, subject then only to the limited consideration of the UCCJA provisions as already discussed.
¶ 29. We find that the Clarke County Chancery Court had jurisdiction to grant *706 the adoption and that the UCCJA had limited applicability in this case.
II. WHETHER THE MINOR MOTHER WAS COMPETENT TO CONSENT TO THE ADOPTION COMPLAINT AND WHETHER SHE RECEIVED PROPER PROCESS.
¶ 30. As previously mentioned, we apply a de novo standard of review on questions of law; however, in discussing the remaining issues, we also apply the following standard of review:
Section 98-17-17 states that “no adoption proceedings shall be permitted to be set aside except for jurisdictional defects and for failure to file and prosecute the same under the provisions of this chapter.” Miss.Code Ann. § 93-17-17 (1994). In addition, whenever reviewing adoption proceedings, we must always remember that the best interests of the child are paramount. Martin v. Putnam, 427 So.2d 1373, 1377 (Miss.1983).
C.L.B., 812 So.2d at 982.
¶ 31. Camille and Sally next assign as error the failure to have Camille served with process upon the filing of the adoption complaint. They claim that this failure, coupled with Rick and Carol instead having Camille, an unmarried minor, to execute the original adoption complaint as a party, deprived the chancery court of jurisdiction.
¶ 32. Camille and Sally refer us to Miss. R. Civ. P. 4(d)(2)(A), which states that service of process shall be made:
upon an unmarried infant by delivering a copy of the summons and complaint to any one of the following: the infant’s mother, father, legal guardian (of either the person or the estate), or the person having care of such infant or with whom he lives, and if the infant be 12 years of age or older, by delivering a copy of the summons and complaint to both the infant and the appropriate person as designated above.
¶ 33. Notwithstanding the provisions of Miss. R. Civ. P. 4(d)(2)(A), we must remember the caveat in Miss. R. Civ. P. 81(a)(9), which provides these rules of civil procedure have limited applicability in the actions described in Title 93 of the Mississippi Code, and that those actions are for the most part governed by statute. The last paragraph of Miss. R. Civ. P. 81(a) states that “[statutory procedures specifically provided for each of the above proceedings shall remain in effect and shall control to the extent they may be in conflict with these rules; otherwise these rules apply.”
¶ 34. Miss.Code Ann. § 93-15-103(2) (Supp.2002) states:
(2) The rights of a parent with reference to a child, including parental rights to control or withhold consent to an adoption, and the right to receive notice of a hearing on a petition for adoption, may be relinquished and the relationship of the parent and child terminated by the execution of a written voluntary release, signed by the parent, regardless of the age of the parent.
(Emphasis added).
¶ 35. Camille originally joined in the adoption complaint, as evidenced by her signature on the document. The chancellor found this act on the part of Camille constituted an abandonment by her of Diane and found that the appropriate Mississippi court had jurisdiction pursuant to Miss.Code Ann. § 93-23-5(l)(c)(i). This finding of abandonment is within the dictates of Miss.Code Ann. § 93-15-103(2), as well as our pronouncement in Bryant v. Cameron, 473 So.2d 174, 178 (Miss.1985):
“Abandonment” does not necessarily refer to some overall course of conduct as *707 “desertion” would, but rather “abandonment” may result from a single decision by a parent, at a particular point in time, where that parent decides to relinquish parental claims. For instance, when after the three day waiting period a parent signs the paper to renounce all rights in the child and place him or her for adoption, at that moment the parent may be said to have abandoned that child. One does not need to wait and see if the natural parent will make overtures to visit the child that has been placed up for adoption before declaring that “abandonment” has taken place.
Id. at 178 (emphasis added).
¶ 36. In Grafe v. Olds, 556 So.2d 690, 694 (Miss.1990), we stated that: “a written voluntary release, or consent by the parent, [§ 93-15-103(2) ] terminates the parental rights and thereafter, no objection to the adoption from the natural parent may be sustained. [§ 93-17-7].”
¶ 37. Miss.Code Ann. § 93-17-7 states in pertinent part:
No infant shall be adopted to any person if either parent, after having been summoned, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it ...
¶ 38. Returning to Grafe, after the inquiry under Miss.Code Ann. § 93-17-7, we must next determine whether the consent was voluntary and abandonment was both physical and legal. C.C.I. v. Natural Parents, 398 So.2d 220 (Miss.1981). “Absent a showing by the parent(s) establishing either fraud, duress, or undue influence by clear and convincing evidence, surrenders executed in strict compliance with the safeguard provision of § 93-17-9, supra, are irrevocable.” Id. at 226. C.C.I. is distinguishable from the case sub judice in that it involved the surrender of a child to an adoption agency, and the “safeguard provision of § 93-17-9” language refers to provisions for surrendering custody to a home (a charitable or religious organization or any public authority granted the power to provide care for or procure the adoption of children.). However, in Grafe, we cited C.C.I. in explaining “undue influence” in a non-adoption agency context. Grafe, 556 So.2d at 694.
¶ 39. In C.C.I., we also stated:
[U]ndue influence is one of several grounds demonstrating a lack of voluntary consent on the part of the parents. Several of the means which may constitute undue influence include over-persuasion, threat of economic detriment or promise of economic benefit, the invoking of extreme family hostility both to the child and mother, and undue moral persuasion. Because undue influence is such a broad concept, cases must be resolved upon their particular facts. General law is that the party asserting undue influence has the heavy burden to show that the consent was obtained by undue influence. Such a burden must be met by clear and convincing evidence, and there is no presumption that a party has exercised undue influence upon another. A mere preponderance of evidence on the issue of undue influence is not sufficient.
C.C.I., 398 So.2d at 222-23 (citing Jack W. Shaw, Jr., What Constitutes Undue Influence in Obtaining Parents Consent to Adoption of Child, 50 A.L.R.3d 918 (1973)).
¶ 40. Turning to the facts of this case, Carol testified that she helped Camille word a letter to have Sally’s guardianship in Arizona terminated, and the guardianship was in fact terminated by an Arizona *708 judge in February 2001. Sally testified that she was not able to afford a lawyer to contest the termination of the guardianship. Carol also testified that the “ideas” in the letter to the Arizona judge were both hers and Camille’s. On the other hand, Camille testified that she had no intention of putting Diane up for adoption until Carol brought it up “jokingly;” that she never initiated any conversations about adoption; that Carol also confided in her that she had considered “cheating on Rick to get pregnant;” that the idea of writing the letter to terminate the guardianship was Carol’s idea; that Carol actually wrote the letter; that Rick and Carol were providing food and shelter and spending money for her and that she was not working at all; that when she told her mother (Sally) of her second thoughts about the adoption on March 18 or 19, Sally immediately left Arizona to come for Camille in Mississippi; that she was afraid to tell Rick and Carol of her change of heart until her mother was close by; that as soon as she told Carol she wanted to withdraw her consent to the adoption, Carol began crying; and, that when Rick found out, he told Camille to get the “f— out of his house” and that “no one was going to take this baby from them — that he would hurt anyone that tried.”
¶ 41. At the close of the case-in-chief as presented by Sally and Camille, Rick and Carol, through counsel, made an ore tenus motion to dismiss pursuant to Miss. R. Civ. P. 41(b), which was granted by the chancellor, but only after a detailed finding of fact which consumed approximately seven pages of the trial record. The chancellor found:
[Camille] khew for a substantial amount of time prior to the time that the adoption papers were drawn up that the adoption was in the works. She knew when Rick and Carol went to the attorney’s office; she knew that the adoption papers were being drawn up, and she went without Rick and Carol to the lawyer’s office.
She could have called her father or her mother at any time during the time that she remained with Rick and Carol. She was not under Rick and Carol’s direct control at all times. She spent substantial periods of time with her boyfriend, Calvin, and could have called either parent at any time.
She had a contemporary with her when she went to the lawyer’s office to sign the papers and that contemporary told her she wouldn’t sign adoption papers, she wouldn’t give up her child, and yet Camille made the decision to go in to the lawyer’s office and complete the process of signing the consent forms.
At the time that she signed the consent forms she was in a relationship with her boyfriend who had asked her to marry [him] and even offered to raise the minor child as his own.
The chancellor’s findings of fact are amply supported by the record. Camille admitted that she and Carol began talking about the adoption in February before the adoption papers were prepared and signed in early March. Neither Carol nor Rick was with Camille when she went to the lawyer’s office to sign the adoption papers, and in fact, Denise, Carol’s college-age sister, accompanied Camille to the lawyer’s office. Additionally, Camille readily admitted that Carol’s own sister, Denise, told Camille that same day that Camille did not have to sign the adoption papers. In fact, Camille admitted that Denise “always told me that if I didn’t want to do it (sign the consent), I didn’t have to. That she wouldn’t have done it.” Camille testified that she and Carol talked about the adoption “probably over ten times.” Camille also stated that she and Calvin, her boy *709 friend, talked about Rick and Carol’s proposed adoption of Diane. Calvin tried to talk Camille out of consenting to the adoption and offered to marry Camille and take care of Diane “as his own.” Finally, Camille admitted that when she was in the lawyer’s office to sign the adoption papers, she read the entire document, and when asked on cross-examination if it were her choice to sign the adoption papers, she replied “yes.”
¶ 42. The record clearly reveals that Camille signed the original complaint for adoption, though she later changed her mind and attempted to withdraw her consent. Under Miss. Code Ann. § 93-15-103(2), as well as Bryant and Grafe, the chancellor was eminently correct in finding that upon joining in the sworn complaint for adoption and requesting, inter aha, that Diane be permanently adopted to Rick and Carol, Camille had in effect relinquished her parental rights to Diane. The record likewise clearly supports the chancellor’s finding that Camille (and Sally) failed to prove by clear and convincing evidence that Camille’s consent to the adoption was procured by Rick and Carol’s exercise of “undue influence or fraud.” C.C.I., 398 So.2d at 222-23.
¶ 43. The record is replete with bad decisions Camille has made her entire life. She has proven herself immature beyond understanding, as evidenced adequately by her own testimony of leaving Diane with almost strangers (Rick and Carol) while she spent the nights at her new boyfriend’s house having sex and smoking marihuana with him.
¶44. The brief of Camille and Sally lists a litany of things minors may not do including voting, entering into binding contracts, etc. Likewise, Camille and Sally discuss in their brief the Mississippi statutory requirement for consent by the parents or legal guardian of an unemanci-pated minor before that minor may have an abortion, as opposed to no such requirement of parental or guardian consent before an unmarried minor gives her child up for adoption.[14] After all, argue Camille and Sally, both a consent to an abortion and a consent to an adoption result in the minor mother being forever deprived of her child. With this, the Court cannot argue. On the other hand, perhaps the learned chancellor in this case said it best when responding to the abortion vs. adoption argument propounded by Camille and Sally:
[The attorney for Camille and Sally] asks the Court to compare allowing a minor to consent to an adoption with not allowing a minor to consent to an abortion. A minor who is contemplating an abortion has not yet become a parent and there is a clear distinction in the law between the way a minor child contemplating an abortion is treated and the way that a minor child contemplating an adoption is considered and it’s the fact of that child’s parenthood that makes that decision different.
There comes a point when a child must become responsible for his or her decisions and our Legislature has set out that a child who has given birth has the capacity to consent to an adoption.
¶ 45. Our adoption statutes state specifically that age does not matter when it comes to voluntarily releasing the child for adoption: “the rights of a parent ... may be relinquished and the relationship of the parent and child terminated by the execution of a written voluntary release, signed *710 by the parent, regardless of the age of the parent.” Miss.Code Ann. § 93-15-103(2) (emphasis added). See Miss.Code Ann. § 93-17-7, which refers to §§ 93-15-101, et seq.
¶ 46. Camille was competent to waive process and has, under our case law and statutes, effectively done so. Additionally her actions, under Mississippi law, constituted an abandonment of Diane, and the chancellor was eminently correct in so ruling.
III. WHETHER THE COMPLAINT FOR ADOPTION SHOULD HAVE BEEN DISMISSED FOR FAILURE TO JOIN AND GIVE NOTICE TO A NECESSARY AND INDISPENSABLE PARTY.
¶47. At issue here is whether failure to join Sally as a party was fatal to the adoption. This issue is disposed of by Miss.Code Ann. § 93-17-5, which states, in pertinent part: “There shall be made parties to the proceeding by process or by the filing therein of a consent to the adoptions proposed ... (1) the parents, or parent, if only one (1) parent, though either be under the age of twenty-one (21) years.” The statute makes no mention of a requirement that the guardian of a minor parent be joined. Camille and Sally assert that “No minor in Mississippi may sue or be sued in his or her own right.” That is the case in nearly all civil settings, but we have express exceptions to this rule through our adoption statutes. Further, while Sally was not made a party to the adoption complaint, she did in the end fully participate in the adoption proceedings via joining in the complaint to revoke consent and to return Diane’s custody to Camille, and additionally, Sally’s testimony at the second hearing consumed approximately sixty pages of the trial transcript in this case. Accordingly, this issue is without merit.
IV. WHETHER DISMISSAL UNDER RULE 41(b) WAS MANIFEST ERROR AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 48. The chancellor granted Rick and Carol motion for dismissal under Miss. R. Civ. P. 41(b), which states in pertinent part:
After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court may then render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court may make findings as provided in Rule 52(a).
¶ 49. Camille and Sally argue that the chancellor employed an erroneous standard in granting the motion to dismiss. The chancellor stated the standard in granting the dismissal as “even in the light most favorable to [Camille],” she failed to meet her burden of proof. Camille and Sally argue that, in granting the motion to dismiss under Rule 41(b), instead of a “light most favorable” test, the chancellor was required to employ a “consider the evidence fairly” test. See Stewart v. Merchants Nat’l Bank, 700 So.2d 255, 258-59 (Miss.1997).
¶ 50. The standard of review applicable on a motion to dismiss under Rule 41(b) is different than that applicable to a motion for a directed verdict. Century 21 Deep S. Props., Ltd. v. Corson, 612 *711 So.2d 359 (Miss.1992); Miss. Real Estate Comm’n v. Geico Fin. Servs., Inc., 602 So.2d 1155 (Miss.1992); Mitchell v. Rawls, 493 So.2d 361, 362-63 (Miss.1986); Davis v. Clement, 468 So.2d 58, 61-62 (Miss.1985). In considering a motion to dismiss, the judge should consider “the evidence fairly, as distinguished from in the light most favorable to the plaintiff,” and the court should dismiss the case if it would find for the defendant. Corson, 612 So.2d at 369 (emphasis added). “The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiffs evidence were all the evidence offered in the case.” Id. (citations omitted). “This Court applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to M.R.C.P. 41(b).” Id. (citations omitted). Stewart, 700 So.2d at 258-59.
¶ 51. In considering the chancellor’s ruling in this case, if anything, the “light most favorable” standard employed by the chancellor would provide Camille even greater protection than the “consider the evidence fairly” rule. As evidenced throughout the record, Camille was not a portrait of maturity, so to consider the evidence in the “light most favorable” to her, would necessarily afford her greater protection than the “consider the evidence fairly” rule. The chancellor even phrased the standard by stating: “It is clear from the facts presented, even in the light most favorable to her, that she has failed to meet that burden of proof.” It is apparent that the chancellor was making every effort to be very cautious before granting the motion, having used the word “even” in her attempt to grant Camille much deference. Even in giving great deference to Camille, the chancellor found she still did not meet her burden of proving undue influence by clear and convincing evidence. The chancellor found:
The burden is on the person objecting to the adoption and requesting the revocation of her consent to show that the consent was obtained by undue influence or fraud. It is clear from the facts presented by the petitioner, even in the light most favorable to her, that she has failed to meet that burden of proof.
¶ 52. Though the testimony of Camille and Sally suggests at least an inference of undue influence, the chancellor was there on the scene and not only heard the testimony of the witnesses, but also had the opportunity to observe their manner and demeanor and ultimately make findings of fact based on the record before the court. See Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983). Accordingly, the chancellor did not manifestly err by finding Camille had failed to meet her burden of proof. As such, the chancellor did not err in granting the dismissal under Miss. R. Civ. P. 41(b).

CONCLUSION

1153. We now hold that the Uniform Child Custody Jurisdiction Act, Miss.Code Ann. §§ 93-23-1, et seq. has limited application to contested adoption cases. Pursuant to our adoption statutes and well-established case law, the Chancery Court of Clarke County, Mississippi was clearly vested with both jurisdiction and venue so as make a final adjudication in this contested adoption proceeding. We also find that Camille’s age of minority at the time of her joining the adoption petition did not render the adoption void in light of Miss. Code Ann. § 93-15-103 and § 93-17-7, which are to be construed in pari materia. Further, this adoption does not fail because of Camille’s mother (Sally) not being joined in the adoption proceedings inasmuch as Sally, under our statutes, was not a necessary party. Finally, the chancellor did not commit reversible error in grant *712 ing the Miss. R. Civ. P. 41(b) motion to dismiss. Accordingly, we affirm the various rulings of the chancellor which denied the efforts of Camille and Sally to revoke Camille’s consent to Diane’s adoption by Rick and Carol and which granted the permanent adoption of Diane to Rick and Carol.
¶ 54. AFFIRMED.
PITTMAN, C.J., SMITH, P.J., WALLER, EASLEY AND GRAVES, JJ., CONCUR. COBB, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.

. There were actually two hearings before the chancellor. The first hearing of April 25, 2001, was confined to the issue of jurisdiction, and the second hearing of September 5, 2001, addressed the adoption issue. The adopted child’s natural mother and adoptive mother testified at the first hearing, and the adopted child’s maternal grandmother .and natural mother testified at the second hearing. By agreement, the chancellor incorporated the evidence and ruling from the first hearing into the record of the second hearing. The facts as set out in this opinion are gleaned from the record of both hearings.

. Pursuant to Miss.Code Ann. §§ 93-17-25, - 29 & -31 (1994), fictitious names are used for the parties to maintain confidentiality.

. The record reveals that Camille had a history of living for awhile with her mother in Arizona, then living with her father in whatever city or state he happened to be living at the time, as well as living with different men for short periods of time.

. This was Camille's second pregnancy. Camille’s mother (Sally) testified that Camille became sexually active at age 12, became pregnant at age 13, and had an abortion in Arizona.

. There is actually conflicting evidence in the record as to whether Camille was living in Llano, Texas, or Buchanan Dam, Texas, when Diane was born.

. Additionally, Camille’s father (Curt) and mother (Sally), though having lived separately for some nine years, were still married.

. Camille admitted under oath that for the first two weeks after moving in with Rick and Carol, she was there "day and night”, but then she began to only stay with Carol and Diane during the day, spending her nights with C.M. (Calvin), having sex and smoking marihuana, and returning to Rick and Carol's home each morning around 7:00 a.m., about the time that Diane was waking up.

. This term is defined as "[n]ow for then ... Nunc pro tunc merely describes inherent power of court to make its records speak the truth, i.e., to record that which is actually but is not recorded.... Nunc pro tunc signifies now for then, or in other words, a thing is done now, which shall have same legal force and effect as if done at time when it ought to have been done.” Black’s Law Dictionary 964 (5th ed. 1979).

. A chancellor in an adoption proceeding no doubt has authority under our adoption statutes to enter temporary custody orders in contested adoptions, Miss.Code Ann. § 93-17-8, and to enter interlocutory decrees, Miss.Code Ann. § 93-17-11. See also Miss. Code Ann. § 93-17-13. Parenthetically, it should also be mentioned that indeed the proceedings were protracted in that a final hearing was not held and a final judgment not entered until September 5, 2001.

. In C.L.B., we noted that the specific inclusion of adoptions was "glaringly absent” from the UCCJA (specifically, Miss.Code Ann. § 93-23-3(d)). 812 So.2d at 983.

. § 93-23-11.
(1) A court of this state shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons.
(2) Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties under section 93-23-17 and shall consult the child custody registry established under section 93-23-31 concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the state court administrator or other appropriate official of the other state.
es) If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction, it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with sections 93-23-37 through 93-23-43. If a court of this state has made a custody decree before being informed of a pending proceeding in a court of another state, it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction, it shall likewise inform the other court to the end that the issues may be litigated in the more appropriate forum.

. Sally was persistent in her belief that her first appearance before the Arizona judge was around February 14, 2001 (because she was able to relate it to Valentine’s Day), and that this second hearing before the judge was in early March 2001. However, at the first hearing in the case sub judice, Rick and Carol's attorney, on cross-examination of Camille, referred to a document dated February 14, 2001, which purportedly terminated the guardianship, although, once again, this document was never offered into evidence.

. As noted by the chancellor, Camille's abandonment of Diane occurred when Camille joined in Rick and Carol’s complaint for adoption by signing the complaint, under oath. Paragraph VII of the adoption pleadings stated, in pertinent part, that Camille, as Diane's natural mother, was of the opinion that it was "in the best interest of [Diane] that she be adopted to [Rick and Carol], and hereby relinquished] all parental rights to [Diane].”

. See Miss.Code Ann. § 41-41-53, -55; R.B. ex rel. V.D. v. State, 790 So.2d 830 (Miss.2001).