# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-00921-SCT

### CONSOLIDATED WITH

## NO. 2023-IA-00813-SCT

### CONSOLIDATED WITH

## NO. 2023-IA-00839-SCT

*IN THE MATTER OF THE PETITION FOR THE*
*ADOPTION OF THE MINOR CHILD NAMED*
*AND DESCRIBED HEREIN, JAMES HINES AND*
*WANDA HINES*

*v.*

*JOHN CALDWELL, AMY CALDWELL AND*
*MISSISSIPPI DEPARTMENT OF CHILD*
*PROTECTION SERVICES*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/2024 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| TRIAL COURT ATTORNEYS: | BENJAMIN DAVID MURPHY |
| | JERRY WESLEY HISAW |
| | MATTHEW THOMPSON |
| | GINGER M. MILLER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JERRY WESLEY HISAW |
| ATTORNEYS FOR APPELLEES: | BENJAMIN DAVID MURPHY |
| | KIMBERLY GOLDEN GORE |
| | JESSICA NICOLE BOYD |
| NATURE OF THE CASE: | CIVIL - ADOPTION |
| DISPOSITION: | AFFIRMED - 11/06/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., ISHEE AND SULLIVAN, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Relatives of a child in foster care appeal the chancellor's decision to grant the foster parents' petition for adoption. The relatives argue that the foster parents were contractually barred from petitioning for adoption in contravention of policies and statutory directives of Mississippi Department of Child Protection Services (CPS) regarding priority placement with relatives and that they were prohibited by judicial estoppel from petitioning for adoption. Because the best interest of the child prevails and because the chancellor's decision was supported by substantial evidence, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     This case previously has been before this Court, and the following facts are reiterated:

> The minor child, J.B., is a female born in March 2021. J.B. came into CPS custody on May 18, 2021, and was placed in the home of John and Amy Caldwell (foster parents) on June 21, 2021. Initially, the permanency plan for J.B. was reunification with a parent or primary caretaker with a concurrent plan of custody with a relative.

> In October 2022, Wanda Hines, maternal great aunt of J.B., learned of the youth court proceedings and contacted CPS about having J.B. placed with her and her husband, James, in Georg[ia] where they reside. The plan for J.B. was changed to adoption with a concurrent plan of custody with a relative.

> On December 13, 2022, the youth court judge entered an order for termination of parental rights of both J.B.'s parents, making her eligible for adoption. In March 2023, the foster parents filed a petition for adoption in the DeSoto County Chancery Court. On April 11, 2023, the foster parents filed a motion asking the youth court to grant them durable legal custody and to transfer the matter to chancery court.

> On May 3, 2023, the relatives filed a motion to intervene and dismiss the adoption proceeding in chancery court. On May 10, 2023, CPS approved the relatives' house for placement. On June 7, 2023, the chancellor granted the relatives' motion to intervene, appointed a guardian ad litem to make a

2

recommendation regarding the child's best interest, and stated it would confer with the youth court to determine status and discuss the jurisdictional issue raised to determine whether the case should be transferred to chancery court.

On June 8, 2023, CPS filed a motion to dismiss or, in the alternative, to stay proceedings, alleging that J.B. was still in the custody of CPS and that it was working on relative placement. Further, CPS alleged that the foster parents have violated their foster contract by pursuing an adoption action.

On June 15, 2023, the youth court judge granted the motion to transfer to chancery court for the chancellor to decide placement and adoption of J.B. On June 21, 2023, the relatives filed an intervening petition for adoption in chancery court. On June 26, 2023, the foster parents filed a motion for modification of durable legal custody in chancery court.

On July 12, 2023, the chancellor met in chambers with the guardian ad litem, the foster parents' attorney, and the relatives' attorney, as well as an attorney for CPS on the motion for modification. The chancellor conducted an "informal hearing" with no record and issued his ruling to the attorneys. The chancellor terminated CPS's legal and physical custody of the child and dismissed CPS from the case, which it said was a final ruling. The chancellor also modified on a temporary basis custody of the child, giving the foster parents durable legal and physical custody and giving the relatives visitation.

The temporary order was filed on July 17, 2023, and the relatives' attorney filed their petition for interlocutory appeal. CPS filed its emergency petition for interlocutory appeal. On August 30, 2023, this Court granted both petitions and consolidated the two appeals.

*Hines v. Caldwell*, 384 So. 3d 1238, 1239-40 (Miss. 2024). On interlocutory appeal, this Court reversed the temporary order for lack of a hearing and remanded the case for a full hearing on the record. *Id.* at 1242.

¶3.     On remand, the chancery court held a hearing on the petition for adoption filed by the Caldwells and on the intervening petition for adoption filed by the Hineses. The chancery court found no requirement that it give relatives preference when granting an adoption and

3

determined that the polestar consideration for granting an adoption is the minor child's best interest. The chancery court found compelling the length of time J.B. had been placed with the Caldwells and, after conducting a best-interest analysis, granted the Caldwells' petition to adopt J.B.

¶4. The Hineses appealed and raise the following issues: 1) whether the Caldwells were contractually barred from seeking the adoption of J.B. before the exhaustion of family placement with CPS; and 2) whether judicial estoppel prohibited the Caldwells from petitioning for adoption.

## ANALYSIS

¶5. "[I]n custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong, clearly erroneous, or an erroneous legal standard was employed." *K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (Miss. 2006) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (Miss. 2002)). "In addition, whenever reviewing adoption proceedings, we must always remember that the best interests of the child are paramount." *C.T. v. R.D.H. (In re Adoption of D.N.T.)*, 843 So. 2d 690, 706 (Miss. 2003) (quoting *C.L.B. v. D.G.B.*, 812 So. 2d 980, 982 (Miss. 2002)). "[T]he chancery court's interpretation and application of the law is reviewed under a de novo standard." *Miller v . Smith*, 229 So. 3d 100, 103 (Miss. 2017) (internal quotation mark omitted) (quoting *Dunbar v. Renfroe (In re Guardianship of Savell)*, 876 So. 2d 308, 312 (Miss. 2004)).

4

**I. Whether the Caldwells were contractually barred from seeking the adoption of J.B. before the exhaustion of family placement with CPS.**

¶6. The Hineses argue that the Caldwells contractually agreed to adhere to CPS policy; therefore, they contend that the Caldwells waived any right to seek the adoption of J.B. before CPS exhausted family-placement options. In 2019, the Caldwells signed a contract for the designation of a resource home, which stated that the Caldwells "agree to cooperate with [CPS] in carrying out [CPS]'s plans for any foster child placed in [their] home, including the plan to return a child to his/her parents, to transfer a child to another foster home or institution, or any other plan which [CPS] may have."

¶7. It is undisputed that one of CPS's primary objectives is to reunite children in foster care with their families. Miss. Code Ann. § 43-15-13 (Rev. 2023). Mississippi Code Section 43-15-13(2) mandates that CPS

> (2) . . . [E]stablish a foster care placement program for children whose custody lies with the department, with the following objectives:
>
> . . .
>
> (b) Preventing the unnecessary separation of children from their families by identifying family problems . . .
>
> . . .
>
> (d) Restoring to their families children who have been removed
>
> . . .
>
> (e) Placing children in suitable adoptive homes . . . in cases where restoration to the biological family is not safe, possible or appropriate[.]

5

Miss. Code Ann. § 43-15-13(2)(b), (d), (e) (Rev. 2023). This policy is further evidenced by

Section 43-15-13(7), which provides:

> When the Department of Child Protection Services is considering placement of a child in a foster home and when the department deems it to be in the best interest of the child, the department shall give first priority to placing the child in the home of one (1) of the child's relatives within the third degree, as computed by the civil law rule.

Miss. Code Ann. § 43-15-13(7) (Rev. 2023). Mississippi Code Section 43-15-13(12)(h)

obligates CPS to "require the following responsibilities from participating persons who

provide foster care and relative care: . . . (h) Cooperating with any plan to reunite the child

with his birth family and work with the birth family to achieve this goal[.]" Miss. Code Ann.

§ 43-15-13(12)(h) (Rev. 2023). Additionally, Mississippi Code Section 43-21-609 provides:

> In neglect and abuse cases, the disposition order may include any of the following alternatives, giving precedence in the following sequence:
>
> (a) Release the child without further action;
>
> (b) Place the child in the custody of his parents, a relative or other person subject to any conditions and limitations as the court may prescribe. If the court finds that temporary relative placement, adoption or foster care placement is inappropriate, unavailable or otherwise not in the best interest of the child, durable legal custody may be granted by the court to any person subject to any limitations and conditions the court may prescribe; such durable legal custody will not take effect unless the child or children have been in the physical custody of the proposed durable custodians for at least six (6) months under the supervision of the Department of Child Protection Services.

Miss. Code Ann. § 43-21-609(a)-(b) (Rev. 2023).

¶8.    In accordance with statutory directives, CPS had been working toward the permanent

6

placement of J.B. with the Hineses at the time the Caldwells filed a petition for adoption. The Hineses argue that the foster contract prohibited the Caldwells from attempting to adopt before the exhaustion of family-placement preference. This Court previously has held, however, that "prospective adoption homes and foster care homes are not mutually exclusive." *In re Adoption of J.C. v. Nat. Parents*, 417 So. 2d 529, 531 (Miss. 1982). There, the foster parents signed a contract to be designated as a foster home, which stated:

> we hereby expressly waive any right to custody of a child placed in our home for Foster Care and expressly agree that we will not attempt to adopt any child placed in our home for Foster Care unless the child is made free for adoption by the written decision and action of the State Department of Welfare.

*Id.* Despite the language in the foster contract, this Court found that "[t]he paramount concern in cases where custody of a child is involved is the child's best interest." *Id.* Consequently, the Court held that the chancellor had manifestly erred by excluding the foster parents as potential adoptive parents. *Id.* at 531-32.

¶9.     Clearly, CPS "has a primary role in the service of the best interests of the child." *L.W. v. C.W.B.*, 762 So. 2d 323, 327 (Miss. 2000). "Nevertheless, it is the court which is charged with the ultimate responsibility of the final determination of what is in the best interests of the child. It is the court which directs the final disposition of the adoption." *Id.* Despite the contention of the Hineses that the Caldwells, and consequently the chancery court, were required to follow CPS policy, it remains abundantly clear that the best interest of the child is the paramount concern in adoption decisions. *In re Adoption of D.N.T.*, 843 So. 2d at 706 (quoting *C.L.B.*, 812 So. 2d at 982). "The law has given **to our courts the most unbounded**

7

**jurisdiction over minors**. Fathers may be preferred to mothers—mothers to fathers, relatives to parents—or strangers to either, for the custody and care of minors, where the interest of the child requires its exercise." ***L.W.***, 762 So. 2d at 327-28 (quoting ***In re Adoption of J.C.***, 417 So. 2d at 531).

¶10.    Moreover, this Court previously has determined that kinship is not decisive but "is only a factor to be considered" when determining the best interest of a child in an adoption proceeding. ***Prante v. Beggiani (In re Beggiani)***, 519 So. 2d 1208, 1212 (Miss. 1988). "[A] relative does not have a preferential right to custody as against unrelated parties because such could foreseeably be against the best interest of the child." ***In re E.M.***, 810 So. 2d 596, 599 (Miss. 2002) (citing ***In re Beggiani***, 519 So. 2d at 1213).

¶11.    The Hineses next argue that, under the foster contract, the Caldwells were barred from seeking to adopt J.B. before she was free for adoption. The Hineses allege, "in the Contract that Part A, subparagraph 1, binds the foster parents (appellants) not to attempt adoption of any child placed in their home for foster care 'unless the child is made free for adoption by the written decision and action of the *State Department of Public Welfare*.'" They claim that nothing in the record suggests that J.B. had become free for adoption by any written decision or action of the welfare department under Part A(1) of the contract.

¶12.    Yet no contract in the record requires that a child become free for adoption by the written decision of the State Department of Public Welfare. Instead, the foster contract containing the Caldwells' signatures states: "[w]e hereby expressly waiver any right to

custody of a child placed in our home for care, unless the child is made free for adoption by the written decision and action *of the court*." The youth court terminated the parental rights of J.B.'s biological parents in December 2022 before the Caldwells filed a petition for adoption. Further, Abbey Young, an assistant deputy commissioner with CPS, testified that the youth court's termination of parental rights freed J.B. for adoption. And the CPS comprehensive family assessment for J.B. states that J.B. was "legally freed for adoption as of 12/12/2022." Therefore, this argument lacks merit.

¶13.    Because the best interest of the child predominates CPS policy, this Court must determine whether the chancellor's decision to grant the Caldwells' petition for adoption was supported by substantial credible evidence. J.B. was born in March 2021, and CPS placed J.B. with the Caldwells in June 2021. In accordance with statutory directives, CPS initially developed J.B.'s permanency plan as reunification with a parent with a concurrent plan of custody with a relative. In March 2022, the youth court determined that reunification with a parent was no longer appropriate and was not in the best interest of J.B. CPS amended the permanency plan for J.B. to adoption with a concurrent plan of custody with a relative. But CPS's attempts to place J.B. with a relative were unsuccessful. A case summary in August 2022 stated that CPS had "identified several relatives and fictive kin but none of them were conclusive for potential placement of the child." It additionally indicated that the Caldwells were interested in adopting J.B. Around October 2022, Wanda learned of the youth-court proceedings and contacted CPS about having J.B. placed with her husband and her.

Thereafter, CPS continued its efforts to place J.B. with her relatives.

¶14. In December 2022, the youth-court judge terminated the parental rights of J.B.'s biological parents, making her eligible for adoption. In March 2023, the Caldwells filed a petition for adoption in the chancery court. At this point, J.B. had been placed with the Caldwells for approximately eighteen months, and the Hineses had not yet seen J.B. in person. The Hineses began in-person visits in April 2023. In May 2023, the relatives filed a motion to intervene and dismiss the adoption proceeding in chancery court, and CPS approved the relatives' house for placement. In June 2023, the chancellor granted the relatives' motion to intervene and appointed a guardian ad litem to make a recommendation regarding the child's best interest. CPS also filed a motion to dismiss the Caldwells' petition or, in the alternative, to stay proceedings, alleging that J.B. was still in the custody of CPS and that it was working on relative placement.

¶15. Ginger Miller, the appointed guardian ad litem, submitted her report recommending that it would be in J.B.'s best interest for the court to grant the Caldwells' petition for adoption. Although Miller spoke highly of the Hineses, she found convincing that the Caldwells' home was the only home that J.B. had ever known. Miller stated that placement in the Caldwells' home would "avoid[] any unnecessary trauma[.]" Miller stated:

> [R]elative placement is very important. Biological family are very important.
>
> What I think is distinctive here is that they tried numerous avenues for either relative placement or next of kin. We've heard testimony about that. Nobody is saying the department didn't do their job in trying to locate people. It is just unfortunate I think in this instance that at the point where the Hines[es]

10

contacted CPS and were able to be considered for placement, we have this child who has spent her entire life with one family.

Miller also stated that she had found no problems or concerns with the Caldwells' home. Johnnie Sykes, an adoption specialist with CPS, testified that the Caldwells' home was a safe environment. She additionally admitted that when a child is removed from the only home they have known, "[i]t can be traumatizing . . . ." Sykes had never removed a child from a foster home that they had been placed in for three years. Also, case summaries for J.B. indicated that she was "healthy and thriving" while placed in the Caldwells' home and that there were no safety concerns. Wanda also testified that the Caldwells had taken good care of J.B.

¶16. The chancellor agreed with the guardian ad litem's recommendation and found that it was in J.B.'s best interest that her adoption be granted in favor of the Caldwells. He found persuasive that the Caldwells' home was the only home that J.B. had ever known. In *In re Adoption of J.C.*, this Court noted that a fifteen-month-old foster child had

> resided with the [foster parents] since it was about seven weeks old. During this period there can be no doubt that the child has become emotionally attached to the [foster parents]. A severance of this relationship during this very important and impressionable age may not be in the child's best interest.

*In re Adoption of J.C.*, 417 So. 2d at 531. At the time of the chancellor's decision, J.B. had resided with the Caldwells for more than three years. Because testimony indicated that the Caldwells were taking good care of J.B. and that there were no safety concerns about the Caldwells or their home and because J.B. had been placed at the Caldwells home for a

substantial length of time, the chancellor's decision was supported by substantial credible evidence. Therefore, we affirm the chancellor's decision to grant the Caldwells' petition for adoption.

**II.      Whether judicial estoppel prohibited the Caldwells from petitioning for adoption.**

¶17.    Lastly, the Hineses assert the doctrine of judicial estoppel and argue that the Caldwells had accepted the position as temporary custodians pending family placement in the youth court and had subsequently changed their position to file for adoption in the chancery court. "[J]udicial estoppel is designed to protect the judicial system and applies where 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" *Clark v. Neese*, 131 So. 3d 556, 560 (Miss. 2013) (internal quotation marks omitted) (quoting *Kirk v. Pope*, 973 So. 2d 981, 991 (Miss. 2007)). It "precludes a party from asserting a position, benefitting from that position, and then, when it becomes more convenient or profitable, retreating from that position later in the litigation." *Id.* (internal quotation mark omitted) (quoting *Richardson v. Cornes (In re Est. Of Richardson)*, 903 So. 2d 51, 56 (Miss. 2005)).

¶18.    We find no merit in this issue. First, the Caldwells were not true parties in the proceedings in the youth court but participated as foster parents. *See* Miss. Code Ann. § 43-15-13(11)(i) (Rev. 2023) (Foster parents are afforded the right to "attend all youth court hearings involving a foster child occurring while that child is placed in their care without being a party to the youth court action . . . ."). Second, caring for a foster child for years and

12

subsequently filing for the adoption of that foster child cannot be considered a situation in which "intentional self-contradiction is being used as a means of obtaining unfair advantage." *Clark*, 131 So. 3d at 560 (internal quotation marks omitted) (quoting *Kirk*, 973 So. 2d at 991). As previously stated, the best interest of the child prevails, and foster parents may be considered as adoptive parents. *In re Adoption of J.C.*, 417 So. 2d at 531.

## CONCLUSION

¶19.   Because the best interest of the child is the paramount consideration in adoption proceedings and because the chancellor's decision was supported by substantial credible evidence, we affirm the decision of the chancery court.

¶20.   **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, P.J., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**